T.C. Memo. 2018-53

UNITED STATES TAX COURT

JOHN E. ROGERS AND FRANCES L. ROGERS, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 30586-09,  1052-12,         Filed April 17, 2018.
15682-13, 30482-13,
20910-14.

John E. Rogers, for petitioners.

Craig Connell, Bernard J. Audet, Jr., Thomas A. Deamus, Frederick Petrino,

Mayah Solh-Cade, and Briseyda Villalpando, for respondent in docket Nos.

30586-09, 1052-12, 15682-13, 30482-13, and 20910-14.

Elizabeth A. Carlson, for respondent in docket No. 20910-14.

---

[1]Cases of the following petitioners are consolidated herewith:  John E.
Rogers and Frances L. Rogers, docket Nos. 1052-12, 15682-13, and 30482-13;
and Frances L. Rogers, docket No. 20910-14.

**[*2]** MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Respondent issued notices of deficiency to petitioners determining income tax deficiencies and accuracy-related penalties as follows (deficiency years):[2]

| Year | Deficiency | Penalty sec. 6662(a) | Penalty sec. 6662(h) | Penalty sec. 6662A |
|------|-----------|-----------|-----------|-----------|
| 2005 | $2,287,696 | $139,449 | $633,623 | $34,033 |
| 2006 | 4,188,051 | 694,266 | 286,688 | 210 |
| 2007 | 403,465 | 80,693 | -0- | -0- |
| 2009 | 1,014,065 | 202,813 | -0- | -0- |

For 2006 respondent determined a 75% fraud penalty under section 6663 against petitioner John Rogers; the above-listed accuracy-related penalties for 2006 are respondent's alternative position.  In his answer for 2009 respondent asserted that petitioners are liable for an addition to tax for failure to timely file a return under section 6651(a).

Petitioner Frances Rogers seeks relief from joint and several liability under section 6015 for 2003 and the above deficiency years.  For 2003 petitioners

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts are rounded to the nearest dollar.

**[*3]** litigated their income tax liability in <u>Rogers v. Commissioner (Rogers 2003)</u>, T.C. Memo. 2011-277, <u>aff'd</u>, 728 F.3d 673 (7th Cir. 2013). The Court determined that petitioners had unreported income from Mr. Rogers' business activities and disallowed certain business expense deductions related to both petitioners' business activities. Petitioners were assessed with income tax and a penalty for 2003 as a result of our decision in <u>Superior Trading, LLC v. Commissioner</u>, 137 T.C. 70 (2011), <u>supplemented by</u> T.C. Memo. 2012-110, <u>aff'd</u>, 728 F.3d 676 (7th Cir. 2013). In November 2013 the Commissioner issued a notice of intent to levy with respect to 2003, and petitioners requested a collection due process (CDP) hearing. Respondent did not make a determination regarding Mrs. Rogers' request for innocent spouse relief in a CDP hearing.

Petitioners litigated their 2004 tax liability in <u>Rogers v. Commissioner (Rogers 2004)</u>, T.C. Memo. 2014-141, which determined that petitioners had unreported income and disallowed business expense deductions related to their business entities. We denied Mrs. Rogers relief from joint and several liability for 2004 in <u>Rogers v. Commissioner</u>, T.C. Memo. 2017-130, <u>appeal filed</u> (7th Cir. Nov. 16, 2017). On January 23, 2018, petitioners filed a motion for partial summary judgment with respect to the penalties against them in these consolidated

[*4] cases on the basis of our decision in Graev v. Commissioner, 149 T.C. ___ (Dec. 20, 2017), supplementing 147 T.C. ___ (Nov. 30, 2016).

After concessions, the issues for consideration are:  (1) whether petitioners have unreported income from the following sources:  trustee fees relating to Mr. Rogers' implementation of distressed debt transactions in 2006, unreported income from Mr. Rogers' business, Portfolio Properties, Inc. (PPI), for 2005 and 2006, and unreported income for 2005 and 2006 relating to the tax consequences of Mrs. Rogers' transfer of real property to her wholly owned S corporation, Sterling Ridge, Inc. (SRI); we hold that they do; (2) whether petitioners and their wholly owned entities are entitled to the following deductions:  a charitable contribution deduction in 2005 for the transfer of real property, a worthless debt deduction relating to Reddy Lab (described infra) or a worthless debt or stock deduction relating to Portfolio Technologies, Inc. (PTI), certain business expenses for 2005, 2006, 2007, and 2009, certain itemized deductions for 2006, and a $5,355 long-term capital loss deduction for 2005; with a few limited exceptions; we hold that they are not; (3) whether Mrs. Rogers is entitled to relief from joint and several liability under section 6015; we hold that she is not; (4) whether petitioners are liable for penalties and an addition to tax as follows:  (a) Mr. Rogers, a section 6663 fraud penalty for 2006; we hold that he is not;

**[*5]** (b) petitioners, accuracy-related penalties under section 6662(a) or (h) or section 6662A for 2005 and 2006 and under section 6662(a) for 2007 and 2009; we reserve this issue for subsequent disposition; (c) petitioners, an addition to tax under section 6651(a)(1) for their failure to timely file an income tax return for 2009; we hold that they are not.

FINDINGS OF FACT

I.    <u>Background</u>

At the time the petitions were filed, petitioners resided in Illinois.[3] They were married during the years at issue, filed a joint income tax return for each year, and remained married at the time of trial. Mr. Rogers is a tax attorney with over 40 years of experience. He has a juris doctor degree (J.D.) from Harvard University and a master of business administration degree (M.B.A.) from the University of Chicago. From January 1998 to June 2003 he was a partner at the law firm Altheimer & Gray. From July 2003 to May 2008 he was a tax partner at Seyfarth Shaw, LLP (Seyfarth Shaw). In 2008 he formed Rogers & Associates as a sole proprietorship. He is also a certified public accountant. Petitioners also owned a number of business entities. Most of the adjustments in dispute here

---

[3]The stipulation of facts and the accompanying exhibits are incorporated therein by this reference.

[*6] relate to income and deductions from these businesses and Mr. Rogers'

activities as an attorney. Mr. Rogers used some of these entities to promote a tax-

avoidance transaction involving Brazilian consumer distressed debt (distressed

debt transactions) that has been the subject of previous Court Opinions. Kenna

Trading, LLC v. Commissioner, 143 T.C. 322 (2014); Superior Trading, LLC v.

Commissioner, 137 T.C. 70. Petitioners were assessed additional tax as a result of

these partnership-level proceedings.

Mrs. Rogers has a bachelor's degree in chemistry, a master's degree in

biochemistry, an M.B.A, a doctorate in educational administration, and a J.D. She

worked as a high school chemistry and computer science teacher and an associate

principal for over 20 years, retiring in 2005. She also has been a licensed real

estate broker since 1967 and a licensed attorney since 1991. In 2009 she began

representing clients in property tax appeals, which she taught herself to perform.

II.     Petitioners' Business Activities

A.      Tax Shelter Promotion Activities

Mr. Rogers implemented and promoted the distressed debt transactions that

give rise to respondent's adjustments through three business entities: (1) PPI,

(2) Sugarloaf Fund, LLC (Sugarloaf), and (3) Jetstream Business Ltd. (Jetstream).

Mr. Rogers formed PPI as its sole shareholder and caused it to elect S corporation

**[\*7]** status in 1992.[4] He formed Sugarloaf and treated it as a partnership for Federal income tax purposes. He formed Jetstream, a British Virgin Islands limited company, with PPI as its sole shareholder to act as Sugarloaf's sole manager and its tax matters partner. Jetstream is a disregarded entity for Federal tax purposes. Mr. Rogers was Jetstream's sole director and manager. Mr. Rogers indirectly owned no more than 1% of Sugarloaf through Jetstream and PPI. However, he controlled PPI, Jetstream, and Sugarloaf during the deficiency years.

Mr. Rogers used Sugarloaf to promote the distressed debt transactions (Sugarloaf transactions) involved in Kenna Trading LLC v. Commissioner, 143 T.C. 322.[5] Sugarloaf acquired distressed consumer receivables (distressed debt) from Brazilian retailers in exchange for a purported ownership interest in Sugarloaf, and Sugarloaf then transferred interests in the distressed debt to individual investors in the Sugarloaf tax shelter through either a partnership or trust structure. In 2004 Mr. Rogers used a partnership structure involving trading

---

[4]As Mr. Rogers is PPI's sole shareholder, we must determine PPI's income and business expense deductions to determine petitioners' income tax liability. Where a notice of deficiency includes adjustments for S corporation items with other adjustments, we have jurisdiction to determine the correctness of all adjustments. See Winter v. Commissioner, 135 T.C. 238 (2010).

[5]The case at docket No. 30586-09 at issue here was one of the consolidated cases of Kenna Trading, LLC v. Commissioner, 143 T.C. 322 (2014).

[*8] and holding companies for the individual investors to hold the distressed debt. Beginning in 2005 and continuing through 2007 Mr. Rogers used a trust structure for the tax shelters in response to legislative changes in 2004 to the subchapter K partnership rules that prevented the tax shelter loss-shifting benefits in his trading and holding company structure.[6] Id. at 324, 328. Under the trust structure, Sugarloaf would form a new trust for each individual who invested in the tax shelter (main trust), and then Sugarloaf would contribute distressed debt to the main trust. The individual investors would have each main trust form a subtrust, and the main trust would assign the debt to the subtrust. The investor would contribute cash to the main trust, typically equal to approximately 6% of the face value of the distressed debt held by the main trust. In exchange, the investor would receive an interest in the main trust and the entire beneficial interest in the subtrust. Mr. Rogers was the trustee of both the main trust and the subtrust formed for each investor; Sugarloaf was the beneficiary. For each investor, Sugarloaf, the main trust, and the subtrust treated the distressed debt as having a carryover basis from the Brazilian retailer that was based on the face value of the

---

[6]The American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 833, 118 Stat. at 1589, changed the rules governing the allocation of built-in loss on property contributed to a partnership, providing that the built-in loss may be taken into account only by the contributing partner. Sec. 704. The change prevented the shifting of the built-in loss on the distressed debt to the investor.

[*9] debt. The investor would have the subtrust claim a worthless debt deduction that was based on partial worthlessness of the distressed debt, typically equal to 97% of the face value of the distressed debt, and the investor (as the purported grantor of the subtrust) would pass the worthless debt deduction through to his personal tax return.

In Kenna Trading, LLC v. Commissioner, 143 T.C. at 324-325, 359-360, the Court held that the tax shelter investors were not entitled to worthless debt deductions for the Sugarloaf transactions for 2004 and 2005. The Court held that Sugarloaf was a sham and not a valid partnership for 2004, and the purported trusts were shams and not trusts for Federal tax purposes for 2005. Id. at 351-353, 362-365. The purported contribution of the distressed debt to Sugarloaf was in substance a sale, and Sugarloaf received a cost basis in the distressed debt, not a carryover basis as claimed. Id. at 353-358. Also Sugarloaf overstated its cost of goods sold for 2004 and had unreported income for 2004 and 2005 and was not entitled to certain deductions for 2004 and 2005. Sugarloaf Fund, LLC v. Commissioner, docket No. 671-10 (Oct. 11, 2017).

Mr. Rogers deducted multiple expenses relating to his Sugarloaf activities, including travel expenses, legal fees, and miscellaneous expenses connected to his promotion and operation of the tax shelter. He advanced funds to Sugarloaf to

[*10] finance its expenses.  He also paid these expenses through his wholly owned entity PPI, and PPI deducted the expenses, including amounts paid to or on behalf of two loan management companies, Multicred Investment, Ltd., and Multicred Investimentos Limitada (collectively Multicred), and a PPI employee, Brad Todd.[7]  See infra Appendix E.  In 2009 Brad Todd worked on issues relating to distressed debt, including engaging a new agency to replace Multicred and finding additional distressed debt portfolios to purchase.  Petitioners incurred expenses as result of a number of disputes that arose in connection with the Sugarloaf transactions, including allegations of mismanagement and theft by individuals connected with Multicred and legal actions by individuals who invested in the tax shelter.  Petitioners also deducted expenses incurred in connection with Mr. Rogers' Sugarloaf activities on Schedules C, Profit or Loss from Business, filed with respect to Mr. Rogers' business activities (Schedule C-1).  See infra Appendix A.

1.    Petitioners' Investments in Sugarloaf Transactions

In addition to Mr. Rogers' promotion of the Sugarloaf tax shelter, petitioners also invested in two Sugarloaf transactions themselves to obtain tax-shelter benefits.  In 2005 SRI, Mrs. Rogers' wholly owned corporation invested in

---

[7]For practical purposes, the two companies are the same, and we refer to them interchangeably as Multicred.

[*11] a Sugarloaf transaction through the trust structure described above that petitioners used to offset their income from SRI. The business activities of SRI are described further infra. In 2006 Mr. Rogers invested in a Sugarloaf transaction through the trust structure. In Kenna Trading, LLC v. Commissioner, 143 T.C. at 359-364, we disallowed the worthless debt deductions claimed by investors in the Sugarloaf transactions for 2004 and 2005. In that case, we disallowed the worthless debt deduction claimed by SRI. Id. at 364. Kenna Trading did not address the Sugarloaf transactions implemented in 2006 and accordingly did not address deductions relating to Mr. Rogers' 2006 Sugarloaf transaction. Respondent filed a motion for partial summary judgment to disallow petitioners' worthless debt deduction for 2006 of approximately $1.94 million, plus nominal legal and fiduciary expenses, relating to Mr. Rogers' 2006 Sugarloaf transaction (Sugarloaf deductions).[8] To accomplish Mr. Rogers' investment in the Sugarloaf transaction, Sugarloaf formed a trust and transferred distressed debt to it, using the structure described above. Mr. Rogers contributed $40,000 to the trust, i.e., the Rogers trust. Sugarloaf and Mr. Rogers created a subtrust (Rogers Subtrust) and allocated the Rogers trust's distressed assets to it. The Rogers Trust and the

---

[8]Respondent disallowed two additional deductions relating to the Sugarloaf transaction on Schedule C-1 for 2006: $1,000 in legal fees and $1,000 in fiduciary expenses. See infra Appendix A.

[*12] Rogers Subtrust claimed a carryover basis in the distressed debt of approximately $2 million. We granted respondent partial summary judgment and held that Mr. Rogers is not entitled to the Sugarloaf deductions for 2006.

In Notice 2008-34, 2008-1 C.B. 645, the Internal Revenue Service (IRS) identified as a listed transaction a distressed debt asset trust transaction in which a U.S. taxpayer acquires an interest in a trust, or a series of trusts and subtrusts, holding distressed assets to obtain built-in tax losses. Mr. Rogers did not submit a Form 8886, Reportable Transaction Disclosure Statement, for 2006 in connection with his Sugarloaf transaction. Nor did SRI file Form 8886 for its 2005 Sugarloaf transaction.

## 2. Fees From the Sugarloaf Transactions

Before 2005 Mr. Rogers used his law firm Seyfarth Shaw to implement the Sugarloaf transactions. Sugarloaf paid a portion of the investors' cash contributions to Seyfarth Shaw as legal fees. In 2006 Seyfarth Shaw told Mr. Rogers to stop implementing the Sugarloaf transactions because of the IRS' inquiries into the transactions. Unbeknownst to Seyfarth Shaw, Mr. Rogers began implementing the Sugarloaf transactions through PPI. Seyfarth Shaw asked Mr. Rogers to resign in May 2008 when it learned that he was still promoting the Sugarloaf transaction.

**[*13]** For the Sugarloaf transactions in 2006, Mr. Rogers was the trustee for each main trust and was entitled to trustee fees under the main trust agreements. Each main trust had a bank account that Mr. Rogers controlled (trust bank account). The investors contributed approximately 6% of the face value of the distressed debt held by their main trust, which were deposited into the trust bank accounts for their respective main trusts. The funds held in the trust bank accounts were paid over to Sugarloaf and Mr. Rogers. Mr. Rogers typically received approximately one-third of the investor's cash contributions; this is approximately the same amount that Seyfarth Shaw had received as legal fees. During 2006 Mr. Rogers received $1,165,500 from the trust bank accounts that he deposited into petitioners' personal bank accounts. Petitioners did not report the deposits as income on their 2006 joint return. Mr. Rogers' accountant altered the copies of the checks he received from the trusts (trust checks) to delete references in their memorandum lines to "trustee fee", "fee", or "hunter fee" before submitting the checks to the IRS during the examination.

B. PPI's Income and Deductions

As described above, Mr. Rogers used PPI to implement the Sugarloaf transactions. Petitioners also used PPI in their real estate development activities including the development of real estate that Mrs. Rogers had inherited from her

[*14] father, discussed further infra, known as Sterling Ridge. During 2006 PPI received at least $1,484,366 in gross income as follows: (1) $710,366 in consulting fees from petitioners' real estate development business, SRI, (2) $240,000 from the Sterling Ridge Trust, (3) $465,000 from Sugarloaf, and (4) $69,000 from Laurence Builders.[9] SRI deducted the consulting fees paid to PPI; Sugarloaf deducted $100,000 of the $465,000 that it paid to PPI as a management fee and amortized the remainder as startup expenses. PPI reported gross receipts of $790,201 for 2006, understating its gross receipts by $694,165. For 2005, 2006, and 2009, PPI claimed business expense deductions that respondent disallowed in the deficiency notices and that remain in dispute to the extent stated infra Appendix E.

III. Real Estate Development Activities

A. Sterling Ridge Subdivision

Mrs. Rogers owned an approximately 31-acre parcel of undeveloped real property in Orland Park, Illinois (Orland Park), that she had inherited from her father.[10] When she inherited the property, its fair market value was approximately

---

[9]PPI did not report these amounts in their entirety on its 2006 tax return; the IRS discovered them during its examination using a bank deposits analysis.

[10]Mrs. Rogers is also the beneficiary of a land trust that owns 81 acres of

(continued...)

[*15] $15,000. During 2004 petitioners partnered with the owner of an adjacent 8.7-acre parcel of land to develop Orland Park into a residential subdivision called Sterling Ridge (Sterling Ridge subdivision). On January 30, 2004, Mrs. Rogers organized SRI as a wholly owned S corporation with an initial capital contribution of $50,000. Mr. Rogers was its president. On that same date Mrs. Rogers entered into a contract to sell Orland Park to SRI for $7 million (Rogers loan), with $50,000 to be paid upon the execution of the sale contract and the remaining balance to be paid by an installment note or by wire transfer at closing. SRI did not transfer the $50,000 upon the contract's execution and did not transfer any money to Mrs. Rogers at closing. SRI did not have any other assets at the time of the transfer. The parties did not execute an installment note for the unpaid balance of the sale price. They did not set a repayment schedule, a maturity date, or an interest charge and did not provide security for a loan. The deed recording the transfer from Mrs. Rogers to SRI was dated January 24, 2005, approximately one year after the date of the sale contract, and was recorded on February 10, 2005.

_____

[10](...continued)
farmland referred to as Oake Pointe that she received from her parents as a gift. Beginning in 2003 petitioners attempted to develop the land into a multiuse retail and residential center, without success. Mrs. Rogers handled issues relating to the land including zoning, repairs, and a cell tower.

[*16] They were required to record the deed as a condition to obtain a third-party construction loan, described below. The deed listed that the consideration was $10 and other good and valuable consideration.

In February 2005 the local municipality approved the Sterling Ridge subdivision and entered into an annexation agreement with SRI and its partner for the subdivision. As a condition of the approval, SRI agreed to convey a portion of Orland Park to the municipality for a park and other public uses. See Village of Orland Park Land Development Code art. 5, sec. 5-112 (requiring a contribution of land or a monetary payment in lieu of a land contribution). The joint property was subdivided into 82 lots for residential construction, with 65 lots owned by SRI and 17 lots owned by SRI's partner, and 3 additional lots dedicated to public use, including a park and detention ponds, with 2 of the lots attributable to SRI's land and one to its partner's. SRI transferred 4.89 acres of Orland Park to the local municipality for public use; the deed evidencing the transfer was recorded in 2012. Petitioners did not claim a charitable contribution deduction for the land transfer to the municipality on their 2005 joint return.

In March 2005 SRI obtained a $2.65 million construction loan (construction loan) from a third-party lender with a maturity date of September 10, 2006. The lender required Mr. Rogers to guarantee the loan. The lender's records do not

**[*17]** reflect the existence of a $7 million liability to Mrs. Rogers. The lender required SRI to repay the construction loan with $135,000 from the proceeds on the sale of each lot. SRI repaid the construction loan in its entirety in 2005. Separate from the construction loan, the local municipality required SRI to maintain a letter of credit to guarantee funding for the development. The terms of the letter of credit required annual renewal. SRI deducted a $23,935 fee for a letter of credit in 2005; respondent disallowed the deduction.

Mrs. Rogers was actively involved in the development of the subdivision. She met with SRI's partner to discuss her vision for the development. She participated in the design and layout of the residential lots, the park, and the ponds and in the design of a model home. She inspected the installation of the park and the ponds to ensure they met her instructions. She assisted with setting the sale terms and the price of the lots. SRI incurred approximately $2.3 million in improvement costs for Orland Park from 2004 through 2006. It sold most of its lots to builders during 2005 and 2006 for $260,000 per lot. In 2005 SRI sold 22 lots and received $282,0000 in deposits on future sales; it reported gross sales of approximately $4.9 million and cost of goods sold of $2.4 million. It reported a net loss for 2005 on the basis of its investment in the Sugarloaf transaction. In 2006 SRI sold 20 lots and reported gross sales of $5,191,467 and cost of goods

[*18] sold of $4,290,605. SRI determined the gain on the sale of the lots using a cost basis of $7 million from its purported purchase of Orland Park. SRI did not sell any lots in 2007 or 2009. As of the end of 2013, SRI had sold 58 of its 65 lots for total sale proceeds of over $13 million.

On their 2005 joint tax return, petitioners reported that Mrs. Rogers received a $1.7 million payment from SRI on the $7 million Rogers loan, including $1.35 million of principal and $350,000 of interest. On its 2005 corporation tax return, SRI reported repayment of shareholder loans of $2.5 million. On their 2006 joint tax return, petitioners reported a $2 million payment from SRI on the Rogers loan, including $1,825,000 of principal and $175,000 of interest.[11] On its 2006 corporation tax return, SRI did not report any repayment of a shareholder loan. SRI reported dividends of over $1.4 million. In total petitioners received approximately $4.15 million from SRI in 2006. Petitioners did not report any repayments on the Rogers loan from 2007 to 2013. Since the origination of the Rogers loan, they have reported approximately $3.2 million in repayment of the loan, plus interest of $525,000.

---

[11]Respondent concedes that if the Court finds that SRI is not entitled to the interest deduction, petitioners were not required to report the interest income.

[*19] PPI constructed homes within the Sterling Ridge subdivision. In 2005 PPI engaged an architect for a fee of $6,340 to design a model home for the subdivision. The architect billed its fee to PPI, but SRI deducted the fee. Respondent also disallowed SRI's deduction of the architect's fee as well as other business expense deductions claimed by SRI relating to the subdivision. See infra Appendix D. PPI did not sell any homes during 2009. However, it reported cost of goods sold of $1,435,711 on the basis of a decline in real property values of the unsold lots in the subdivision. Petitioners concede the cost of goods sold except to the extent of $141,781.

B.     Renovation Projects

Mrs. Rogers purchased two residential properties with the intention of renovating and reselling them for a profit. She purchased a house on Manitou Road in Homer Glen, Illinois (Manitou house), directly and purchased a second house on Sterling Road in Kenilworth, Illinois (Sterling Road house), through SRI.[12] During 2005 through 2007 petitioners' adult son lived in the Manitou house with his family. He supervised the contractors who renovated the house and provided manual labor. In 2006 SRI paid and deducted $60,000 in rent to Mrs.

---

[12]The Sterling Road house is unrelated to the Sterling Ridge subdivision and is approximately 50 miles from it.

[*20] Rogers for the Manitou house on the son's behalf.  See infra Appendixes C and D.  Petitioners reported the rent as income on Mrs. Rogers' Schedule C for her real estate activities (Schedule C-2).  The son was an employee of PPI but did not have an employment contract.  He was the only employee of PPI who was provided housing.  PPI is not an owner of either house.  The reasoning for SRI to pay and deduct the rent for a PPI employee is unclear from the record except that PPI was involved in the development of the Sterling Ridge subdivision.  Mrs. Rogers sold the Manitou house in 2007, reporting a capital gain.  During 2009 the son lived in the Sterling Road house with his family.  As of the date of trial SRI still owned the Sterling Road house.  Petitioners deducted numerous expenses relating to the Manitou house for 2005, 2006, and 2007, in addition to the 2006 rent, and the Sterling Road house for 2009, including interest, repairs, taxes and licenses, utilities, bank service charges, and insurance, on their Schedules C-2 or on SRI's and PPI's corporation tax returns.  See infra Appendix C.

IV.    Reddy Labs and Portfolio Technologies, Inc. (PTI)

In 1991 Mr. Rogers began working for a startup medical device company as its president and chief operating officer.  He created a holding company structure for the medical device company, collectively Reddy Lab, to hold the patent on the medical device and to manufacture and distribute the device.  Mr. Rogers worked

[*21] to obtain financing for the company.  Beginning in late 1991 Mr. Rogers lent money to Reddy Lab personally and through his wholly owned S corporation, Lucas & Rogers, Inc. (L&R).  L&R is a real estate brokerage firm.  Mr. Rogers resigned from Reddy Lab in July 1993.  From 1992 through 1995, entities within the Reddy Lab structure were involved in multiple bankruptcies.  Its creditors, including Mr. Rogers, filed an involuntary bankruptcy in May 1995 (1995 bankruptcy).  The trustee in the 1995 bankruptcy found that Mr. Rogers and his related entities (L&R and a trust in Mrs. Rogers' name) had general unsecured claims of over $3.3 million, including unpaid interest that arose from advances to Reddy Lab and payments on personal guaranties of Reddy Lab's debts.  Approximately $500,000 was owed to Mr. Rogers, including principal and interest; the remainder was owed to his related entities.  The Reddy Lab entity involved in the 1995 bankruptcy also owed over $1.5 million in secured claims to entities unrelated to Mr. Rogers.  In 1995 Mr. Rogers initiated a lawsuit against the inventor of the medical device, separate from the involuntary bankruptcy, alleging fraud.  Petitioners wrote down the value of the debt owed by Reddy Lab to $400,000 in 1995 and reported that they were worthless on their balance sheet, dated July 1, 1996.  The IRS allowed petitioners a $915,000 worthless debt deduction for 1998 with respect to Reddy Lab.

[*22] In 1997 Mr. Rogers organized PTI, as its president. In 1998 PTI purchased the patent rights to the medical device from Reddy Lab in a sale approved in the 1995 bankruptcy. The asset purchase agreement required PTI to pay a 10% royalty on its sale proceeds from the medical device and a portion of any licensing fees for the patent to the bankruptcy trustee. In 1998 L&R assigned its approximately $2 million bankruptcy claim, including approximately $1.3 million of principal plus unpaid interest, to PTI in exchange for stock. L&R owned at least 20% of PTI. Although Mr. Rogers was a shareholder of PTI, his exact ownership percentage was not established at trial.

After PTI acquired the patent rights, it attempted to bring the device to market. See Rogers 2004, at *11-*12. However, it faced serious obstacles to marketing the product, including competition from the inventor of the medical device and Reddy Lab's original owner. Mr. Rogers contracted with Global Protection Corp. (Global Protection) to provide management services for PTI and to market the medical device. Global Protection became a shareholder of PTI. Mr. Rogers lent money to PTI and paid its expenses to maintain an inventory. PTI recorded on its books and records an initial liability of $45,000 and a liability of $363,000 from 2004 owed to Mr. Rogers from his payment of expenses for inventory and supplies. PTI did not issue any notes evidencing the liabilities.

**[\*23]** During this time PTI did not pay amounts owed to the bankruptcy trustee under the sale agreement.

In 2005 PTI initiated a patent infringement lawsuit, which was decided against PTI in U.S. District Court in October 2007 and affirmed in the Court of Appeals for the Federal Circuit in June 2008. Mr. Rogers kept PTI in existence to pursue the patent infringement case. He understood that PTI needed to continue to market the medical device to establish that a domestic market existed for the product for purposes of the infringement case. He believed that the only way that he would receive money from PTI was through a judgment in the patent infringement case, not through sales of the product. In 2007, after PTI received a favorable ruling by an administrative law judge and before it ultimately lost the infringement case in District Court, Mr. Rogers paid the bankruptcy trustee $400,000 for the trustee's relinquishing any right to unpaid royalties and to future payments under the asset purchase agreement. PTI recorded a $400,000 liability payable to Mr. Rogers from this payment. In total PTI recorded liabilities to Mr. Rogers of $808,000. PTI dissolved in 2010 and wrote off the $808,000 debt to Mr. Rogers. PTI's liabilities exceeded its assets on its books and records beginning in 2000 and including the time of Mr. Rogers' advances. Over the course of the infringement case, Mr. Rogers had PPI pay expenses on PTI's behalf

[*24] because PTI did not have sufficient funds to meet its operational needs. The record contains no evidence that PPI had an ownership interest in PTI. PPI deducted a "PTI subsidy" and legal expenses that it paid on PTI's behalf.[13] See infra Appendix E. Petitioners seek worthless debt deductions for liabilities owed by Reddy Lab or PTI or worthless stock deductions for PTI.

## V.     Deductions and Losses

Petitioners filed two Schedules C for each deficiency year reporting their business activities. Mr. Rogers reported his business activity as an attorney on Schedule C-1; Mrs. Rogers reported her business activity as a realtor on Schedule C-2. See infra Appendixes A and B. Mr. Rogers also filed a Schedule C for 2003, at issue for Mrs. Rogers' section 6015 relief. During the deficiency years petitioners reported numerous personal expenses as business expenses on their joint income tax returns or on the corporation tax returns for their business entities, including expenses relating to their personal residence such as alarm services, utilities, insurance, taxes, repairs, automobile expenses, and club dues. See infra Appendix A. In many instances they deducted 100% of the expenses incurred for their personal residence. However, they used at most one room

---

[13]PPI deducted $908,474 in legal expenses for 2005, including $579,730 paid on PTI's behalf. It paid the remaining the legal expenses with respect to the Sterling Ridge subdivision or Sugarloaf.

[*25] exclusively for business purposes and failed to establish the relative size of the room compared to the entire home. Most of their business use for the remainder of their residence consisted of storage. During 2005 through 2007 Mr. Rogers maintained an office at Seyfarth Shaw. During 2009 he maintained an office at Rogers & Associates. During 2005 and 2006 Mrs. Rogers had an office at SRI. During 2009 she represented clients seeking property tax abatement and assisted her husband at Rogers & Associates where she maintained an office. Petitioners also deducted personal living expenses for their son and his family, who were living at the Manitou and Sterling Road houses, including utilities, landscaping, and insurance. They traveled frequently and deducted substantial travel expenses on their Schedules C-1 and the corporation tax returns for L&R and PPI. See infra Appendixes A and E. For 2005, 2006, and 2007 they deducted travel expenses for Mr. Rogers' work at Seyfarth Shaw. Seyfarth Shaw had a policy that would have reimbursed him for his travel, including travel for client services, certain partnership issues, continuing legal education, and $3,000 for promotional travel. Mrs. Rogers frequently accompanied her husband on his business trips. For 2009 Mr. Rogers provided legal services through Rogers & Associates and reported his income and expenses from his legal services on Schedule C-1. He was unable to collect approximately $1.4 million of the legal

[*26] fees that he recorded as billed to clients for 2009 and deducted the uncollected fees as returns and allowances. See infra Appendix A.

Petitioners presented QuickBooks records, canceled checks, and credit card statements to substantiate the reported expenses. At times they provided receipts and invoices. Often the canceled checks, receipts, invoices, and QuickBooks records do not reconcile with each other and with the amounts deducted on their returns. Petitioners used their credit cards for both personal and business reasons and did not make any adequate effort at trial to distinguish between personal and business expenses. In many instances they did not provide sufficient information and documentation to establish that they are entitled to deduct the expenses respondent disallowed except to the extent indicated in the Appendixes. They also incorrectly reported numerous transactions between their businesses where the payor entity deducted the payment but the payee entity did not report the payment as income. They also claimed a long-term capital loss for 2005 of $53,550. They concede $48,195, and $5,355 remains in dispute. But they failed to provide any evidence regarding the capital loss. Respondent has also disallowed amounts that petitioners deducted for taxes, interest, and other expenses of $11,745, $4,659, and $1,770, respectively, on their 2006 Schedule A, Itemized Deductions, that remain in dispute.

**[\*27]** A.    <u>L&R's Deductions</u>

L&R deducted travel expenses of $50,543 and $39,741 for 2005 and 2006, respectively, and respondent disallowed these deductions in their entirety. Mrs. Rogers was a real estate agent and broker at L&R. There is minimal information relating to the activities of L&R in the record. The deducted travel expenses relate to Mr. Rogers' activities with Sugarloaf, PTI, and his legal work as a partner at Seyfarth Shaw. At times Mrs. Rogers accompanied Mr. Rogers on his travel, and L&R deducted her travel expenses.

B.    <u>PPI's Deductions</u>

PPI deducted numerous business expenses for 2005, 2006, and 2009; respondent disallowed the deductions. <u>See</u> <u>infra</u> Appendix E. PPI deducted expenses that were related to Mr. Rogers' Sugarloaf tax shelter activities, including a "Multicred fee" for 2005, legal fees for 2005, 2006, and 2009, and payments and rent relating to Brad Todd, who worked on issues relating to Sugarloaf, discussed above. PPI also deducted travel, meal, and automobile expenses under multiple categories including meals, taxi, airfare, hotel, gasoline, repairs, parking, and travel, that respondent has disallowed in their entirety. It also deducted expenses relating to PTI's patent infringement lawsuit and its business activities, including a PTI subsidy and legal fees, as discussed <u>supra</u> part IV. PPI

[*28] did not have an ownership interest in PTI but paid these expenses because of Mr. Rogers' ownership of both companies. PPI also deducted personal expenses for repairs for the Manitou house and medical expenses for their adult son and his family when PPI did not have a health insurance plan for its employees. During 2005 PPI purchased an employee benefits program and deducted its costs for subsequent years.

VI.  Tax Returns

Petitioners timely filed their joint tax returns for 2005, 2006, and 2007 under extensions. Respondent received petitioners' 2009 joint return on October 20, 2010. The 2009 return had a postmark date of October 14, 2010. Petitioners did not file a request for an extension for 2009, and respondent has no record of granting an extension. For 2006, 2007, and 2009, petitioners reported income tax liability of zero and reported a nominal amount of income tax due for 2005. Mr. Rogers reported income from Seyfarth Shaw in excess of $500,000 for 2005, 2006, and 2007. Mr. Rogers prepared the joint income tax returns for each year at issue, the entity income tax returns for PPI, SRI, L&R, and Sugarloaf, and the returns for various trusts.

[*29] VII.    Innocent Spouse Relief

Mrs. Rogers has requested section 6015 relief from joint and several liability for 2003 through 2012.  We have previously denied her request for relief for 2004.  See Rogers v. Commissioner, T.C. Memo. 2017-130.  We now consider her request for relief for 2003, 2005, 2006, 2007, and 2009. Throughout their marriage petitioners filed joint income tax returns prepared by Mr. Rogers, including returns for the years at issue.  In 2003 Mrs. Rogers earned a salary as an associate principal, retiring in 2005.  She organized SRI in 2004 and participated in its business activities.  Petitioners had a routine for preparing their joint returns that they followed every year.  Mrs. Rogers would provide the necessary documents relating to her income to her husband, and he would prepare the returns and review them with her.  She asked questions when she did not understand something and asked whether the returns were accurate and complete.  She had access to the documents used to prepare the returns but did not review them.  She was concerned with the amount of their income tax and would discuss with her husband whether any tax payment was due with the filing of the return and whether they had any losses.  She understood that any losses would reduce their taxable income.  She was aware that they paid little or no income tax during the years at issue.  She also understood that the distressed debt transactions promoted

**[*30]** by her husband produced large tax benefits for a relatively small investment. She knew that SRI's participation in the Sugarloaf transaction reduced her income tax from SRI's sale of the subdivision lots. Mrs. Rogers also reviewed SRI's corporation tax returns before they were filed. She understood that SRI's income or loss would pass through to her on petitioners' joint income tax return.

Mrs. Rogers was an active participant in petitioners' financial affairs and businesses activities. Throughout the years at issue, petitioners maintained joint bank accounts and credit cards, and Mrs. Rogers maintained accounts in her own name. She had at least 41 accounts at 15 financial institutions. She had complete access to petitioners' financial records, joint bank accounts, and credit card statements. She was involved in household finances, paid bills, made purchases from their joint bank accounts, and made deposits. She endorsed checks from the joint accounts for both personal and business expenses. She joined her husband on extensive travel and maintained a high standard of living. She purchased real estate and luxury automobiles, including some for her adult son. She assisted her husband in his legal work, including preparing documents to set up corporations for his clients. In 2008 she assisted with the client invoices, bank deposits, and bill payment and endorsed checks on behalf of Rogers & Associates. She is a licensed attorney and represented clients in property tax abatements. In April

[*31] 2009 Mr. Rogers was hospitalized for an extended period relating to his alcohol addiction, during which time there was no means of communication between petitioners. Mrs. Rogers became more involved at Rogers & Associates. She fired the office manager and took over that position herself.

On August 24, 2007, respondent issued a notice of deficiency to petitioners for 2003, determining a deficiency of over $1.3 million, plus an accuracy-related penalty and interest. The deficiency resulted from Mr. Rogers' income from PPI and certain deductions claimed in connection with PPI. Petitioners timely filed a joint petition in this Court (2003 deficiency case). They were represented by counsel, and Mrs. Rogers sat at the table reserved for petitioners and their counsel during the trial. See Rogers 2003. She did not raise a claim for innocent spouse relief at any stage of the 2003 deficiency case. Id. The Court sustained respondent's determinations in part and entered a decision. Id. Petitioners paid the 2003 deficiency, penalty, and interest, and Mrs. Rogers now seeks a refund. She has filed three different Forms 8857, Request For Innocent Spouse Relief. On the third form, she answered for the first time that she had experienced abuse from her husband. She reported assets of over $8.1 million. She did not provide a Form 433-A, Collection Information Statement. Petitioners continued to file joint income tax returns for years as recent as 2014.

**[\*32]**                                          OPINION

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Gold Emporium, Inc. v. Commissioner, 910 F.2d 1374, 1378 (7th Cir. 1990), aff'g T.C. Memo. 1988-559. However, the Commissioner bears the burden of proof "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a)(1). In these cases, respondent has raised new matters relating to the characterization of the transfer of Orland Park to SRI and a late-filing penalty for 2009 and has the burden of proof on those issues, as discussed further infra. Generally, taxpayers have the burden of proof with respect to their entitlement to any deduction. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. at 115. Taxpayers are required to maintain sufficient records to substantiate their gross income, deductions, credits, and tax attributes. Sec. 6001; INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; see sec. 1.6001-1(a), Income Tax Regs.

The Court of Appeals for the Seventh Circuit has stated that the presumption of correctness does not apply and the burden of proof will shift to the Commissioner where the Commissioner's deficiency determination does not have

**[\*33]** a rational foundation or is arbitrary and excessive. Pittman v. Commissioner, 100 F.3d 1308, 1313 (7th Cir. 1996) (citing Ruth v. United States, 823 F.2d 1091, 1094 (7th Cir. 1987)), aff'g T.C. Memo. 1995-243. For the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner must make an evidentiary showing that connects the taxpayer with the alleged unreported income. Pittman v. Commissioner, 100 F.3d at 1313. As discussed further infra, we find that the Commissioner has made an evidentiary showing to connect petitioners with the unreported income from PPI and Sugarloaf, see infra part I.A. and B., and petitioners have the burden of proof with respect to these issues.

Petitioners made factual assertions in their briefs that are not supported by evidence in the record and referred to exhibits that were not admitted into the record. Statements on brief are not evidence and cannot supplement the record. See Rule 143(c); Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992); Kronish v. Commissioner, 90 T.C. 684 (1988). Petitioner's opening brief failed to propose findings of fact as required by Rule 151. Their brief contains factual assertions in narrative form combined with legal arguments and lacks citations of the record to support a substantial portion of the factual assertions. In their reply brief they objected to respondent's proposed findings of fact but, in substantial

**[*34]** part, did not provide supporting references to the record for their objections. The record consists of a 1,262-page transcript for an 8-day trial and 25 sets of stipulations of fact and accompanying exhibits, and petitioners failed to adequately assist the Court with the voluminous record. See Beane v. Commissioner, T.C. Memo. 2009-152, slip op. at 7 (citing Stringer v. Commissioner, 84 T.C. 693, 703-705 (1985), aff'd without published opinion, 789 F.2d 917 (4th Cir. 1986)); Lenihan v. Commissioner, T.C. Memo. 2006-259, slip op. at 4 n.3.

I.      Unreported Income

Respondent determined that petitioners had unreported income from three sources: trustee's fees relating to Mr. Rogers' implementation of the Sugarloaf transactions, unreported income from PPI, and unreported income on the basis of respondent's recharacterization of Mrs. Rogers' purported sale of Orland Park to SRI as a capital contribution.

A.      Trustee's Fees

Respondent determined that petitioners failed to report income of $1,165,000 for 2006 that Mr. Rogers received as trustee's fees for his role in implementing the Sugarloaf transactions. During 2006 investors implemented the Sugarloaf transactions through a tiered trust structure. The investors entered into trust agreements that named Mr. Rogers as trustee and compensated him with

[*35] trustee's fees.  Each main trust had its own bank account, but all accounts were at the same bank.  Each investor contributed cash to the main trust that was deposited into the trust's bank account.  During 2006 Mr. Rogers issued checks totaling $1,165,000 from the trusts' bank accounts to himself, endorsed them, and deposited them into his personal bank account.  The checks contained notations in the memo line, at times written by Mr. Rogers, of "trust fee", "fee", "trustee" or "hunter fee".  Mr. Rogers generally received one-third of the investors' cash contributions, and a portion of the investors' contributions was paid to Sugarloaf.

Petitioners argue that the $1,165,000 was not taxable income; they do not dispute that they received the money.  They argue that the deposits were nontaxable reimbursements of advances or nontaxable returns of capital on the basis that Mr. Rogers made payments to, or on behalf of, Sugarloaf from 2003 through 2006 that increased his basis in Sugarloaf.  They argue that the disallowed deductions for prior years were capital expenditures that increased Mr. Rogers' basis in Sugarloaf, referring to his entitlement to "capitalized contemporaneous conduit deductions" to offset the income from the trustee's fees.[14]  To further

_____

[14]In addition to the capitalized contemporaneous conduit deductions, petitioners also argue that they experienced a theft loss of $1 million in 2005 that increased their basis in Sugarloaf.  We  previously found that petitioners failed to prove a theft occurred.  Kenna Trading, LLC v. Commissioner, Dkt. No. 671-10

(continued...)

[*36] support this argument, petitioners contend that they reported the trustee's

fees received during 2007 as income because the 2006 receipts eliminated the

basis in Sugarloaf. However, at times, petitioners argue that 2007 distributions

from Sugarloaf are nontaxable to the extent of Mr. Rogers' basis in Sugarloaf.

They initially included the trustee's fees as income on a draft of their 2006 joint

income tax return but changed their reporting position after receiving a notice of

deficiency for 2003, taking the position that the 2006 payments were not income.

At the outset we note that the 2003 case did not involve Sugarloaf.[15] See Rogers

2003. In 2003 Mr. Rogers implemented the Sugarloaf transactions through

---

[14](...continued)
(order denying in relevant part petitioners' motion for a new trial dated Aug. 22, 2016, at 7-8). Likewise, in these consolidated cases petitioners have not established that a theft occurred.

[15]Petitioners misrepresent the findings of the 2003 case. Rogers v. Commissioner, T.C. Memo. 2011-277. During 2003 PPI received approximately $2.4 million related to distressed debt transactions implemented through Warwick Trading, LLC. PPI transferred approximately $1.2 million to Multicred and retained approximately $1.2 million. Id., slip op. at 7. On its return PPI deducted the $1.2 million transferred to Multicred. The Court held that PPI was not required to report as income the amount transferred to Multicred and thus was not entitled to deduct the transferred amount. Id. PPI was taxed only on the retained $1.2 million. Id. The Court rejected PPI's argument that it held the retained amount in trust or as a conduit for Warwick Trading or Jetstream as it found no evidence to support that position. Id. at 7-8. The Commissioner initially disallowed PPI's deduction for legal fees in the notice of deficiency but conceded the deduction. Id. at 9.

[*37] Warwick Trading, LLC (Warwick Trading), not Sugarloaf. Petitioners appear to abandon any arguments relating to 2003 but continue to advance multiple arguments that attempt to relitigate prior years' tax liabilities to offset the adjustments to income in these cases.[16] Kenna Trading, LLC v. Commissioner, 143 T.C. at 365, did not hold that Mr. Rogers may treat the expenses relating to the promotion of an abusive tax shelter as capital expenditures. Rather, it denied section 162 business expense deductions on the basis that expenses relating to the Sugarloaf transactions were incurred to obtain abusive tax shelter benefits. Id.

We find that petitioners received unreported income of $1,165,000 from the trustee's fees during 2006. Under the terms of the trust agreements, Mr. Rogers had the right to payment of the trustee's fees, and he received those fees. Sugarloaf did not have any right to the trustee's fees. The trusts paid the fees, not Sugarloaf. Mr. Rogers received similar amounts as legal fees for implementing distressed debt transactions in prior years through Seyfarth Shaw. Seyfarth Shaw directed Mr. Rogers to terminate the transactions in 2006. Instead he began to implement the transactions through PPI. Respondent argues that Mr. Rogers

_____

[16]Petitioners argue that we should reject respondent's determinations with respect to the Sugarloaf transactions because he failed to audit the returns of the subtrusts that engaged in the Sugarloaf transactions. We have previously found that this argument is without merit. See Kenna Trading, LLC v. Commissioner, 143 T.C. at 374 n.41.

[*38] structured the Sugarloaf transactions to receive trustee's fees instead of legal fees to avoid Seyfarth Shaw's policy that required him to pay over any legal fees that he earned to the firm. The amounts of trustee's fees are consistent with his past income from implementing distressed debt transactions.

Petitioners have not established that Mr. Rogers had an ownership interest in Sugarloaf and thus do not have a capital account for purposes of a basis determination. Mr. Rogers previously represented that he did not have a direct ownership interest in Sugarloaf and indirectly owned no more than 1% through Jetstream. See id. at 352 (stating that documents show that the Brazil retailers owned 215% of Sugarloaf). Nor have they established a loan arrangement between Mr. Rogers and Sugarloaf although they presented canceled checks and wire transfers as evidence of advances to Sugarloaf. Petitioners assert that Mr. Rogers advanced money to Sugarloaf for startup expenses. They made a similar argument in their 2004 case, unsuccessfully arguing that a payment from Sugarloaf to Mr. Rogers was a nontaxable repayment of a loan. See Rogers 2004. They would not be entitled to treat expenses paid on Sugarloaf's behalf as capital expenditures simply because they were denied ordinary and necessary business expense deductions for the expenses.

**[\*39]** B.     PPI's  Unreported Income

Respondent determined that petitioners had unreported income from PPI for 2005 and 2006.  After concessions respondent alleges that PPI received $30,000 from SRI in 2005 that it failed to report.  SRI deducted the $30,000 payment. Petitioners did not present any evidence to dispute respondent's position that the $30,000 is income.  Accordingly, we find that PPI had unreported income of $30,000 for 2005.[17]  For 2006 respondent determined, using a bank deposits analysis, that PPI understated its gross receipts by $694,165.  Bank deposits are prima facie evidence of income.  DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).  Respondent's bank deposits analysis is supported by the record.  During 2006 PPI deposited the following amounts into its bank account:  (1) $710,366 in consulting fees from SRI, (2) $240,000 from the Sterling Ridge Trust, (3) $465,000 from Sugarloaf, and (4) $469,000 from Laurence Builders.  PPI transferred $400,000 of the $469,000 received from Laurence Builders to SRI; SRI reported it as income, and it is not includable in

---

[17]Respondent also argues for the first time on brief that Mr. Rogers received $100,000 of the Multicred fee paid by PPI in 2005 and seeks to characterize it as a shareholder distribution taxable to the extent provided by application of the S corporation rules.  The taxation of the $100,000 distribution is a new issue not properly raised before trial, and we will not consider it here.  Dirico v. Commissioner, 139 T.C. 396, 416 (2012).

**[*40]** PPI's 2006 gross receipts. PPI retained the remaining $69,000. On the basis of these deposits PPI had gross receipts of $1,484,366 for 2006. It reported gross receipts of $790,201, understating its gross receipts by $694,165. Petitioners did not offer any explanation for treating the deposits from the Sterling Ridge Trust and Laurence Builders as nontaxable income.

With respect to the SRI deposit, SRI deducted the $710,366 as consulting fees.[18] See infra Appendix D. Although SRI deducted this payment as a business expense, petitioners argue that PPI is entitled to treat $350,000 as repayment of a loan that PPI made to SRI in 2005. The record establishes a $350,000 transfer to SRI. However, SRI's corporate records did not treat the transfer as a loan, and petitioners have failed to establish the existence of a debt. We find that the deposit from SRI is income to PPI in accordance with SRI's treatment of the item. Similarly, petitioners argue that PPI is entitled to treat the Sugarloaf deposits as a loan repayment. Petitioners have provided a minimal amount of evidence of purported transfers from PPI to Sugarloaf or on Sugarloaf's behalf to support their argument that the deposits were loan repayments. However, Sugarloaf, an entity that Mr. Rogers controlled, did not treat the deposits as loan repayments. It

---

[18]Respondent concedes that if the payment is includable in PPI's gross receipts, SRI is entitled to deduct the fee.

[*41] deducted $100,000 as a management fee to PPI and amortized the remainder as startup expenses. In the alternative, they argue that PPI is entitled to treat its 2006 deposits as a nontaxable distribution to the extent of its basis in Sugarloaf and to increase its basis by any disallowed business expense deductions, including the Multicred fee in 2005. See infra Appendix E. However, there is no indication that PPI held such an equity interest in Sugarloaf. Moreover, as discussed further infra, they have not substantiated the payment of the Multicred fee or any other expense paid in connection with Sugarloaf. Nor have they established the business purpose of the expenditure that would allow PPI to treat the payments as capital expenditures or to increase PPI's basis in Sugarloaf if PPI in fact did have an ownership interest in Sugarloaf.

Petitioners appear to make a third argument; their brief is convoluted and confusing. They argue that PPI paid over the Sugarloaf deposits to individuals involved in the Sugarloaf transactions but have provided no proof of such payments. Petitioners make a series of arguments about overstatements of revenue and double taxation in past years and among different entities. They repeatedly cite incorrect tax years or misstate the facts from the prior years as set forth in the Court's prior opinions. They attempt to relitigate their 2004 case, where they sought to decrease the amount of gross receipts reported on PPI's return, arguing

[*42] that PPI included the amount in its gross receipts by mistake and that PPI was holding the money in trust. We rejected these arguments. See Rogers 2004. Petitioners also argue that both Sugarloaf and PPI reported the income from the Sugarloaf transactions, resulting in double taxation. The evidence does not establish inappropriate double taxation. Petitioners have not established that any of the four sources of deposits is nontaxable. Accordingly, we find that PPI understated its gross receipts for 2006 by $694,165.

### C. Transfer of Orland Park to SRI

Mrs. Rogers entered into a contract to sell Orland Park to her wholly owned S corporation, SRI, for $7 million, i.e., the Rogers loan. SRI determined its gain on the sales of the subdivision lots of Orland Park during 2005 and 2006 by including the $7 million in its basis. Petitioners contend that the Rogers loan included imputed interest. Respondent argues that the land transfer should be recharacterized as a capital contribution to SRI (rather than a sale), and SRI's basis in Orland Park is not increased by the purported $7 million sale price.[19] According to respondent's argument, SRI underreported its income on the sale of

_____

[19]Respondent concedes that the recharacterization of Mrs. Rogers' transfer of Orland Park to SRI as a capital contribution is a new matter for 2005, shifting the burden of proof to him. See Rule 142(a). Respondent did not challenge the property's basis in the 2005 notice of deficiency. Respondent did challenge SRI's basis in Orland Park in the 2006 notice of deficiency.

**[\*43]** the subdivision lots for 2005 and 2006 by overstating its basis.  As an alternative argument, respondent argues that petitioners underreported their income from the installment sale of Orland Park under section 453(a) or (e) for 2005 and 2006.

The characterization of a shareholder's transfer to a closely held corporation as either a sale that creates a bona fide debt or a capital contribution is determined by all the surrounding facts and circumstances.  Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).  The Court of Appeals for the Seventh Circuit has considered the following eight factors for determining whether to treat a transfer between a shareholder and his corporation as debt or equity: (1) testimony regarding the  intent to repay, (2) the extent of the shareholder's control of the corporation; (3) the retained earnings and dividend history of the corporation; (4) the size of the transfer, (5) the presence of conventional indicia of debt, such as a promissory note, collateral, and interest charges; (6) treatment of advances in corporate records; (7) the history of repayment; and (8) the taxpayer's use of the funds.  Busch v. Commissioner, 728 F.2d 945, 948-949 (7th Cir. 1984) (considering whether a shareholder's withdrawal was a loan or a dividend), aff'g T.C. Memo. 1983-98.  The Court of Appeals for the Seventh Circuit treats these objective factors as indications of the parties' intent.  Id. at 948.

[*44] We have identified a nonexclusive list of 13 factors to consider when determining the nature of transfers to closely held corporations: (1) the names or labels given to the transfer by the parties and the instruments evidencing the transfer and indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payments; (5) participation in management as a result of the advances; (6) the status of the advances in relation to regular corporate creditors; (7) the intent of the parties; (8) the identity of interest between the creditor and the shareholder; (9) "thinness" of the capital structure in relation to the debt, i.e., the debt-to-equity ratio; (10) the ability of the corporation to obtain credit from outside sources; (11) the use to which advances were put, i.e., to purchase capital assets or to pay operating expenses; (12) the failure of the debtor to repay; and (13) the risk involved in making the advances. Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 285 (1990); Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493. No single factor is controlling, and not all factors may apply to each case. John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493-494. A shareholder's transaction with a closely held corporation is subject to close scrutiny but does not preclude the existence of a bona fide debt. Fin Hay Realty Co. v. Commissioner, 398 F.2d 694, 697 (3d Cir. 1968); C.M. Gooch Lumber

[*45] <u>Sales Co. v. Commissioner</u>, 49 T.C. 649, 656 (1968); <u>Am. Underwriters, Inc. v. Commissioner</u>, T.C. Memo. 1996-548. The enumerated factors are aids in evaluating the transaction; the ultimate question is: "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" <u>Litton Bus. Sys., Inc. v. Commissioner</u>, 61 T.C. 367, 377 (1973).

Mrs. Rogers entered into a sale agreement for Orland Park in exchange for a $7 million loan with a $50,000 deposit.[20] She entered into the sale agreement on the same date that she incorporated SRI with a $50,000 capital contribution. SRI did not make any payment at closing or pay the $50,000 deposit as required by the sale contract. While SRI reported the transfer as creating a liability in its books and records and on its tax returns, including interest payments in 2005 and 2006, petitioners failed to observe the formalities of a debt. They did not issue a note or a debt instrument. They did not record a mortgage or a lien on the property. They did not execute or record a deed for the transfer of Orland Park for nearly one year

---

[20]Petitioners argue that respondent is barred by claim preclusion or laches from contesting the treatment of the transaction as a sale because the sale occurred in 2004 and respondent failed to raise the issue in the notice of deficiency or in the trial for 2004. We find that this argument is without merit. It is well established that each tax year stands on its own. <u>See</u> <u>United States v. Skelly Oil Co.</u>, 394 U.S. 678, 684 (1969).

[*46] after entering the sale contract and executed and recorded the deed at that time because they were required to do so to obtain a construction loan from a third-party lender. There was no repayment schedule or fixed maturity date, and a portion of the alleged loan remained outstanding at the time of trial, 11 years after its origination despite SRI's earning over $13 million from the sale of the subdivision lots. Petitioners had complete control over SRI, with Mrs. Rogers as its sole shareholder and Mr. Rogers as its president. SRI paid $6 million of its $13 million sale proceeds to Mrs. Rogers, and petitioners reported approximately $3.2 million of the $6 million as repayment on the loan principal. They characterized over $2 million as a nontaxable return of capital. Mr. Rogers testified that SRI had no obligation to repay the unpaid balance of the loan at any specific date. There was no collateral or guaranty.[21] SRI was newly incorporated and held no other assets, except for an initial capital contribution of $50,000. It used the alleged debt to acquire the essential asset of the corporation. It was thinly capitalized. In contrast SRI obtained a $2.65 million construction loan from a third-party lender that required collateral and Mr. Rogers' personal guaranty. The construction loan had a fixed maturity date within 18 months of its origination and

_____

[21]On brief petitioners argues that SRI paid dividends to Mrs. Rogers in 2006. However, there were no corporate records of a dividend.

[*47] a repayment schedule that required SRI to pay $135,000 from the sale proceeds of each lot, representing over 50% of the $260,000 sale price per lot. It repaid the construction loan in full by the end of 2005, before its maturity date, indicating payment to Mrs. Rogers was subordinate to the third-party creditor or a preference to repay the third-party creditor. Respondent suggests that petitioners did not disclose the $7 million debt to the lender because its records did not contain any information regarding the alleged liability.

The source of the payments to Mrs. Rogers was SRI's earnings from the sale of the subdivision lots, and payment depended on the successful sale of the lots. Mrs. Rogers continued to bear the risk of loss and the risk that Orland Park's market value would decrease. SRI made only two payments against the principal in 2005 and 2006 when it sold most of the subdivision lots for nearly $11 million. She did not receive any payments after 2006 despite the continued sale of the lots. At the time of the trial SRI still owed approximately $3.8 million on the purported loan, without considering interest. The sale of the remaining four unsold lots would not likely generate sufficient funds to repay the loan. Moreover, appraisals of Orland Park suggest that SRI would not have been able to repay the $7 million sale price at the time of the land transfer. The third-party lender on the construction loan appraised the land for approximately $4.6 million to $6.1

[*48] million.  Petitioners obtained an appraisal in 2014 that valued Orland Park at $6.28 million as of May 26, 2005.  Both appraisals included the land conveyed to the municipality for public use that would not have generated revenue to pay the $7 million sale price.

We find that Mrs. Rogers did not intend to create a bona fide debtor-creditor relationship.  An unrelated lender would not have extended credit to SRI on similar terms.  On review of the enumerated factors, we find that Mrs. Rogers and SRI did not create a bona fide debt upon the transfer of Orland Park.  Rather, Mrs. Rogers made a capital contribution of the property to SRI, and SRI had a carryover basis in Orland Park.  See sec. 362.  By including the $7 million debt in its basis for Orland Park, SRI underreported its income on the sale of the subdivision lots for 2005 and 2006.

Petitioners argue that if we recharacterize the land transfer as a capital contribution, the income resulting from the sale of the subdivision lots should be taxed as capital gain under section 1237.  The character of the income is a new issue raised for the first time on brief.  The Court afforded the parties an opportunity to amend their pleadings before the trial and instructed the parties to request leave to amend their pleadings by July 15, 2015.  Petitioners timely filed a request with a proposed amended petition.  They did not raise the issue of the

[*49] capital gain treatment for the subdivision lots or include any reference to section 1237.  Nor did they raise this issue in the pretrial memorandum or at trial.  Throughout their posttrial briefs, petitioners repeatedly raise new issues not in the pleadings.  We will not consider this issue as doing so would be prejudicial to respondent.  Dirico v. Commissioner, 139 T.C. at 415-417.  SRI reported the revenues from the sale of the lots as ordinary income on its corporation tax returns.  SRI included the costs of improvements to the basis of the lots, contrary to the rules of section 1237(b)(3)(C).  Petitioners entered into a business venture to develop Orland Park with a business partner, borrowed significant amounts of money to improve the land for purposes of its subdivision, and constructed homes on the lots, including a model home.  See sec. 1237(b)(3)(A); sec. 1.1237-1(c)(4), Income Tax Regs.  They received at least one unsolicited offer for Orland Park for $5 million in 2003.  Petitioners rely on caselaw that is distinguishable from the limited facts that have been developed here that are relevant to a determination of whether section 1237 applies.  See Bauschard v. Commissioner, 279 F.2d 115 (6th Cir. 1960), aff'g 31 T.C. 910 (1959); Riedel v. Commissioner, 261 F.2d 371 (5th Cir. 1958), rev'g T.C. Memo. 1957-210.[22]

---

[22]Riedel v. Commissioner, 261 F.2d 371 (5th Cir. 1958), rev'g T.C. Memo. 1957-210, predates the enactment of sec. 1237 as do at least two of the three years

(continued...)

**[*50]** SRI treated its acquisition of Orland Park as a purchase costing $7 million, and as a result overstated its costs of goods sold for 2005 and 2006. For 2005 SRI sold 22 lots and reported the cost of goods sold of $2.4 million.[23] For 2006 it sold 20 lots and reported the cost of goods sold of $4,209,605. Respondent concedes that SRI incurred costs of improvements of $103,418, $1,891,853, and $307,105 in 2004, 2005, and 2006, respectively. See sec. 263(a); W.C. & A.N. Miller Dev. Co. v. Commissioner, 81 T.C. 619, 632 (1983). Petitioners have not substantiated improvement costs in excess of respondent's concessions; however, petitioners are entitled to treat the letter of credit fee and the architect's fee as capital expenditures as explained infra in section II.D.1 and 2.[24]

---

[22](...continued)
at issue in Bauschard v. Commissioner, 279 F.2d 115 (6th Cir. 1960), aff'g 31 T.C. 910 (1959).

[23]Respondent concedes that $282,000 of the gross receipts reported for 2005 was deposits made for sales that occurred in 2006.

[24]Petitioners contend that SRI had a $150,000 basis in each lot in the Sterling Ridge subdivision, which would result in a 2005 cost of goods sold for SRI of $3.3 million. The $150,000 basis per lot depends on the inclusion of the $7 million purported purchase price. SRI sold 22 lots in 2005 (22 x $150,000 = $3.3 million). However, SRI reported the cost of goods sold of $2.4 million on its 2005 tax return. Petitioners also argue that SRI omitted from its cost of goods sold for 2005 the cost of six lots that it sold to its business partner in a bargain sale for $450,000. Both of these positions depend on including the $7 million purported loan in SRI's basis for Orland Park. As we have found that SRI cannot include the

(continued...)

[*51] For 2006 SRI reported a cost of goods sold of over $4.2 million. However, petitioners' position, to use a basis of $150,000 per lot, does not support the cost of goods sold in excess of $3 million. They have not adequately provided support for the excess of approximately $1.2 million in the cost of goods sold reported for 2006. They suggest that it could have included a markdown in the value of SRI's unsold lots at the end of 2006 to $100,000 per lot. They have not cited any legal authority to support a markdown in the unsold lots and did not obtain an appraisal to support the markdown. During 2006 SRI sold the lots for $260,000 each, and it is inconsistent to discount the unsold lots to $100,000 in the same year without further evidence. Accordingly, we hold that in determining its taxable income SRI overstated its cost of goods sold for 2006.

## II.    Deductions

### A.    Charitable Contribution Status of SRI's Land Transfer to Municipality

Petitioners argue that they are entitled to a $1 million charitable contribution deduction for the transfer of 4.89 acres of Orland Park to the municipality for 2005. They did not claim this deduction on their 2005 joint tax

---

[24](...continued)
$7 million purported purchase price in its basis, both of petitioners' arguments fail.

[*52] return or SRI's 2005 corporation tax return.[25]  We note that the deed

conveying the land to the municipality was dated March 2012.  Respondent argues

that petitioners are not entitled to the charitable contribution deduction because

they were required to transfer the land to the municipality to obtain approval for

the subdivision.  Section 170(a) allows taxpayers to deduct charitable

contributions.  The phrase "charitable contribution" has generally been defined as

synonymous with the term "gift".  Elrod v. Commissioner, 87 T.C. 1046, 1075

(1986); DeJong v. Commissioner, 36 T.C. 896, 899 (1961), aff'd, 309 F.2d 373

(9th Cir. 1962).  A gift is generally defined as a voluntary transfer of property

without adequate consideration.  Osborne v. Commissioner, 87 T.C. 575, 581

(1986).  A gift is made with detached and disinterested generosity.  Commissioner

v. LoBue, 351 U.S. 243, 246 (1956).  A taxpayer may not deduct a payment as a

charitable contribution if the taxpayer received a substantial benefit in return.

United States v. Am. Bar Endowment, 477 U.S. 105, 116-117 (1986).  A payment

that is part of a quid pro quo arrangement is not a deductible charitable

---

[25]Petitioners also seek a $260,000 charitable contribution deduction on the basis that SRI transferred land to its business partner to reimburse it for its  land contribution to the municipality.  They did not raise the $260,000 deduction in their pleadings or pretrial memorandum or during trial.  Accordingly, we will not consider this new issue and disallow the $260,000 deduction.  See Dirico v. Commissioner, 139 T.C. at 416.

**[*53]** contribution.  Hernandez v. Commissioner, 490 U.S. 680, 701-702 (1989);

United States v. Am. Bar Endowment, 477 U.S. at 117-118.  A taxpayer is not

entitled to a charitable contribution deduction for a land transfer where she obtains

a "direct or indirect benefit in the form of enhancement in the value or utility of

the taxpayer's remaining land or otherwise to benefit the taxpayer."  Elrod v.

Commissioner, 87 T.C. at 1075 (quoting Sutton v. Commissioner, 57 T.C. 239,

243 (1971)).  A taxpayer's legal obligation to convey the property also negates a

donative intent.  Pettit v. Commissioner, 61 T.C. 634, 640-641 (1974).

Petitioners are not entitled to a charitable contribution deduction for the

land transfer to the municipality because SRI conveyed the land to obtain approval

for the subdivision, and thus petitioners lacked donative intent.  See id.

(disallowing charitable contribution deduction where taxpayer granted rights of

way to obtain approval for subdivision); Perlmutter v. Commissioner, 45 T.C. 311

(1965) (disallowing charitable contribution deduction where taxpayer conveyed

property for school and recreational uses to obtain approval for subdivision).  The

municipality required petitioners to convey a portion of Orland Park as a condition

for approval of the subdivision.  This requirement was stated in the agreement that

SRI entered into with the municipality for the annexation of the subdivision and

was required by the municipality land development code.  See Village of Orland

**[*54]** Park Land Development Code art. 5, sec. 5-112 (requiring a contribution of land or a monetary payment in lieu of a land contribution). The transfer was a quid pro quo exchange. The subdivision of Orland Park increased its value, providing a substantial benefit to petitioners.[26] See Elrod v. Commissioner, 87 T.C. at 1075-1079.

Petitioners argue that they are entitled to the charitable contribution deduction because the parks and detention ponds that they developed for Orland Park and contributed to the municipality were superior to parks and ponds in the neighboring subdivisions and exceeded the specifications required by the municipality. For example, they argue that SRI provided for a larger detention pond and a larger setback area than required by law. Where a taxpayer receives consideration for a charitable contribution, he may still deduct as a charitable contribution the fair market value of the property that the taxpayer transferred less the fair market value of the goods that the grantee organization provided in

---

[26]We further note that petitioners failed to obtain a contemporaneous written acknowledgment for the land transfer from the municipality or a qualified appraisal of the land at the time of the transfer as required for a charitable contribution deduction. See sec. 170(f)(8)(A), (11). Petitioners argue that they substantially complied with the substantiation requirements and had reasonable cause for their failure to substantiate the contribution because of a misunderstanding of the law. We do not address this issue as we have found that petitioners lacked the requisite donative intent.

**[\*55]** exchange for the contribution. Rolfs v. Commissioner, 135 T.C. 471, 486-487 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012); sec. 1.170A-1(h)(1) and (2), Income Tax Regs. The burden is on the taxpayer to make this showing. Sec. 1.170A-1(h)(1), Income Tax Regs. Petitioners have not established the value of the enhancements to the park and ponds above the specifications required by law.

B.     Reddy Lab and PTI Deductions

Petitioners seek worthless debt or worthless stock deductions with respect to their activities with Reddy Lab and PTI. Their arguments are inconsistent and confusing. They appear to argue for: (1) a $1.3 million worthless debt deduction for amounts owed by Reddy Lab, (2) an $808,000 worthless debt deduction for amounts owed by PTI, (3) a worthless stock deduction for Mr. Rogers' PTI stock, and (4) an approximately $2 million worthless debt deduction for L&R's claims against Reddy Lab or a worthless stock deduction for its PTI stock. L&R is not entitled to deduct $2 million in claims against Reddy Lab as a worthless debt. Pursuant to an agreement dated October 8, 1998, L&R assigned its $2 million claim to PTI in exchange for stock. L&R has not established any other debt owed by Reddy Lab.

Petitioners raise the issues relating to the worthless stock deductions for PTI stock owned by Mr. Rogers and L&R for the first time on brief. These issues are

[*56] not properly before the Court.  See Dirico v. Commissioner, 139 T.C. at 415-417. Accordingly, they are not entitled to the worthless stock deductions.

### 1.    Reddy Lab Worthless Debt Deduction

Petitioners seek a $1.3 million worthless debt deduction in connection with alleged liabilities owed by companies within the Reddy Lab structure (Reddy notes) for 2005 or, in the alternative, any deficiency year.  Following an audit for 1992 through 1998, the IRS allowed petitioners a $915,000 worthless debt deduction for 1998 in connection with amounts owed to them by companies within the Reddy Lab structure.  Petitioners argue that the 1998 worthless debt deduction did not involve debt by the Reddy Lab entity involved in the 1995 bankruptcy and instead involved debt owed by separate entities involved in early bankruptcies.  Petitioners failed to provide evidence of any liabilities except for the liabilities in the 1995 bankruptcy, and we do not find Mr. Rogers' testimony that the 1998 deduction related to separate liabilities to be credible.  The bankruptcy trustee found that petitioners and their related businesses had over $3.3 million in unsecured general claims; however, most of the claims were held by L&R and a trust, not petitioners.  The debt to Mr. Rogers individually was approximately $500,000, and the IRS allowed a $915,000 deduction.  The remainder of the debt was owed to L&R and a trust in Mrs. Rogers' name.

[*57] We find that petitioners are not entitled to a worthless debt deduction with respect to any advances that Mr. Rogers made to entities with the Reddy Lab structure for 2005 or any year at issue because Mr. Rogers failed to establish a debt in excess of the amount previously deducted. For a section 166 worthless debt deduction, taxpayers must show: (1) the transfer created a valid debt and was not equity contributions, (2) the debt became worthless during the year, and (3) the debt was incurred in connection with a trade or business. Sensenig v. Commissioner, T.C. Memo. 2017-1, at *17-*18; sec. 1.166-1(c), Income Tax Regs. A worthless nonbusiness debt is deductible as a short-term capital loss. Sec. 166(d)(1); sec. 1.166-5(a)(2), Income Tax Regs. It is likely that the Reddy notes were worthless long before the years at issue as evidenced by the 1995 bankruptcy. For a section 166 deduction, the debt must become worthless during the tax year, i.e., it must have value at the beginning of the year and became worthless during that year. Milenbach v. Commissioner, 106 T.C. 184, 204 (1996), aff'd in part, rev'd in part on other grounds, 318 F.3d 924 (9th Cir. 2003). The determination of when a debt becomes worthless depends upon the particular facts and circumstances of each case. Id. A taxpayer must generally show that identifiable events occurred to render the debt worthless during the year for which the taxpayer claimed the deduction. Am. Offshore, Inc. v. Commissioner, 97 T.C.

**[*58]** 579, 593 (1991).  Some objective factors considered by the Court in determining worthlessness include the value of property securing the debt, the debtor's earning capacity, events of default, the debtor's refusal to pay, actions to collect the debt, any subsequent dealings between the parties, and the debtor's lack of assets.  Id. at 594-595.  No single factor is conclusive.  Id. at 595.  Debts become worthless when the taxpayer has no reasonable expectation of repayment.  Crown v. Commissioner, 77 T.C. 582, 598 (1981).  Bankruptcy is an indication of the worthlessness of an unsecured debt.  Sec. 1.166-2(c), Income Tax Regs.  Mr. Rogers' claims were subordinate to secured claims of over $1.5 million, and the bankrupt estate held no assets and had a right to receive 10% of PTI's sales, which ranged between approximately $300,000 and $600,000 annually.  Petitioners wrote down the Reddy notes to $400,000 in 1995 and reported them as completely worthless on their personal balance sheet, dated July 1, 1996.  They have not established that the Reddy notes had any value at the beginning of 2005.  They are not entitled to a worthless debt deduction for any deficiency year with respect to debt owed by any entity within the Reddy Lab structure.  They also have not established the other two requirements for section 166, that the debt was a bona fide debt rather than a capital contribution to Reddy Lab or was incurred in a trade or business.

[*59]    2.    PTI Worthless Debt Deduction

Petitioners also seek an $808,000 worthless debt deduction for amounts that Mr. Rogers advanced to PTI, including the $363,000 in payments to finance PTI's inventory in 2004 and the $400,000 payment to the bankruptcy trustee in 2007. Respondent objects to the worthless debt deduction relating to PTI as a new issue. Petitioners raised this issue at trial and presented evidence relating to the Mr. Rogers' transfer to PTI. Nevertheless, we find that petitioners failed to establish that a valid debtor-creditor relationship existed between PTI and Mr. Rogers, and we deny the deduction. For a section 166 deduction, the debt must arise from a debtor-creditor relationship based upon a valid and enforceable obligation to pay fixed or determinable sum of money. Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs. The evidence shows that Mr. Rogers entered into a business relationship with PTI to make a profit on the sale of the medical device. He did not advance funds for the purpose of earning interest income. He believed that PTI had the potential to become a multimillion-dollar company. He was concerned with profits as a shareholder of PTI. After an initial victory (later reversed) in the patent case, Mr. Rogers paid $400,000 to release PTI from its obligations to pay the bankruptcy trustee. Mr. Rogers made this payment in 2007, following years in which PTI had reported its insolvency on its books and

**[\*60]** records and had failed to pay its debts to unrelated persons. His main concern was profits as a business owner. He believed that PTI could potentially recover over $1 million in damages in the patent litigation.

We have previously held that Mr. Rogers made the payments to fund the continued operation of PTI to protect his investment in the company and the payments were nondeductible capital contributions to PTI. Rogers 2004, at \*12-\*13, \*56. We further held that PPI could not deduct the payments. Id. at \*56. Mr. Rogers wanted to make a profit from the sale of the medical device and to recover damages from the alleged infringement of PTI's patent rights. Id. at \*12-\*13, \*56. Likewise, we find that petitioners are not entitled to a worthless debt deduction for any amounts paid on PTI's behalf in these cases because Mr. Rogers made the payments to protect his investment in PTI. Mr. Rogers' payments were capital contributions to PTI. Moreover, petitioners failed to address the traditional factors that the Court considers to determine whether a shareholder's advance to his corporation is a valid debt or a capital contribution. See Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493-494. PTI entered the $808,000 debt on its books and records but did not issue a debt instrument, did not set an interest charge, maturity date, or payment schedule, and did not provide any collateral. It did not have the capacity to repay the advances when they were made. Mr. Rogers kept

[*61] PTI alive, by his own admission, solely to enable the patent litigation to proceed. Petitioners did not state a year for which they seek a deduction. The debt must have value at the beginning of the year of the deduction and become worthless during the year. Milenbach v. Commissioner, 106 T.C. at 204; sec. 1.166-1(c), Income Tax Regs. The debt was arguably worthless when the transfer was made. Approximately half of the PTI deduction ($363,000) arose to pay for production costs in 2004, and Mr. Rogers lent another $400,000 in 2007 without any payment of the prior debt. Petitioners are not entitled to a worthless debt deduction for any of the $808,000 advanced to PTI for any deficiency year.

C.    Business Expense Deductions

Petitioners filed two Schedules C with their joint tax returns for the deficiency years, Schedule C-1 for Mr. Rogers' business activities as an attorney and Schedule C-2 for Mrs. Rogers' business activities as a realtor. They deducted expenses relating to their personal residence, including mortgage interest, insurance, utilities, repairs, and alarm services, on the basis that they used their residence as a home office. See infra Appendix A. They also deducted personal expenses relating to their automobiles and substantial amounts of personal travel. See infra Appendix A. They deducted expenses relating to the personal residence of their adult son who lived at the Manitou house with his family, including

[*62] depreciation, mortgage interest, repairs, taxes, and utilities. See infra Appendixes A, B, and C. They also deducted expenses relating to the Manitou house on PPI's 2005 corporation tax return and SRI's 2006 corporation tax return. See infra Appendixes C and D. Petitioners provided QuickBooks records, canceled checks, and credit card statements to substantiate their business expenses. They provided invoices or receipts for only a limited number of the expenses. Often the amounts deducted do not correspond to the QuickBooks records, checks, and credit card statements. The QuickBooks entries often do not correspond to the canceled checks and credit card statements. They used the credit cards for both personal and business expenses, failed to adequately distinguish the expenses as personal verus business, and deducted personal expenses. They lacked adequate business records for a substantial portion of the disputed deductions. See sec. 6001.

Section 162(a) permits taxpayers to deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business. See Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. 345, 352 (1971). Taxpayers may also deduct expenses incurred for the production of income. Sec. 212. Section 262(a) disallows deductions for personal, living, or family expenses. See also sec. 1.162-17(a), Income Tax Regs. Generally, the taxpayers have the burden to prove to

[*63] their entitlement to any deduction and must maintain adequate records to substantiate their deductions. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; Welch v. Helvering, 290 U.S. at 115. When a taxpayer establishes that he paid or incurred a deductible expense but does not establish the amount of the expense, we may estimate the amount allowable in some circumstances (the Cohan rule). Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). There must be sufficient evidence in the record on which we can base an estimate. See Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In estimating the deductible amount, we bear heavily upon the taxpayer who failed to maintain the required records. Cohan v. Commissioner, 39 F.2d at 544.

Strict substantiation rules apply to travel, meal, and entertainment expenses and expenses relating to passenger vehicles, including parking, and preclude the use of the Cohan rule. Secs. 274(d), 280F(d)(4); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985); see Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969). When the strict substantiation rules apply, the taxpayer must substantiate by adequate records or sufficient evidence corroborating his own statement: (1) the amount of the expense, (2) the time and the place of the expense, (3) the

[*64] business purpose of the expense, and (4) his business relationship to the person benefited by the expense. Sec. 274(d); see Shea v. Commissioner, 112 T.C. 183, 187 (1999). The taxpayer must maintain adequate records to establish each of the above elements of the expenditure. Sec. 1.274–5T(c)(1) and (2), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985). Taxpayers may rely on a contemporaneous log, other records, such as a diary or account book, that they maintained at or near the time they incurred the expense, or other sufficient evidence that includes a detailed personal statement corroborated by other evidence that has "a high degree of probative value to elevate such statement" to the level of credibility of a contemporaneous record. Id. subparas. (1) through (3). A taxpayer's testimony without corroborative evidence is not sufficient substantiation. Wolfgram v. Commissioner, T.C. Memo. 2010-69, slip op. at 24.

### 1. Home Office Deduction

Petitioners contend that they used 50% of their personal residence as a home office and seek to deduct expenses relating to their personal residence, including mortgage interest, insurance, utilities, taxes, alarm services, and repairs.[27] See

---

[27]Petitioners deducted repairs of $3,145 and utilities of $3,109 relating to their personal residence on their 2007 Schedule C-1 and their 2005 Schedule C-2,

(continued...)

[*65] infra Appendixes A and B. However, for certain expenses they deducted 100% of the incurred expense. Section 280A(a) disallows deductions with respect to a taxpayer's residence with an exception for a home office. Sec. 280A(c)(1). Home office expenses are deductible if a portion of the dwelling unit is used exclusively and regularly for business purposes. Hamacher v. Commissioner, 94 T.C. 348, 353-354 (1990). A taxpayer may deduct expenses allocable to the portion of the residence used as a home office. Sec. 280A(c)(1); see Stricker v. Commissioner, T.C. Memo. 1995-530. Petitioners must establish that they used a portion of their residence regularly for business purposes and that they used the identifiable portion of their residence exclusively for business purposes. Petitioners argue that they used five rooms in their residence plus a portion of their basement for business purposes but admitted that these rooms (with the possible exception of one room that Mr. Rogers used as an office) were not used exclusively for business purposes. They admitted that the business use of their residence consisted primarily of the storage of business records; use of a home to store business records does not qualify the expenses for a home office deduction. Sec. 280A(c)(2); see Druker v. Commissioner, 697 F.2d 46 (2d Cir. 1982)

[27](...continued)
respectively. See infra Appendixes A and B.

[*66] (holding that storage of legal files and business records did not qualify for home office deduction), aff'g in part, rev'g in part 77 T.C. 867 (1981); Banatwala v. Commissioner, T.C. Memo. 1992-483 (disallowing a home office deduction for storage use by an insurance salesman). Mr. Rogers' home office was not his principal place of business as he maintained offices at his law firms during the deficiency years. See sec. 280A(c)(1)(A).

Petitioners did not provide sufficient evidence relating to the percentage of the home used for business purposes, i.e., the size of the room that Mr. Rogers allegedly used for an office in relation to the size of their home. They failed to adequately establish the portion of their home used exclusively and regularly for business. See sec. 280A(c)(1). Accordingly, they are not entitled to business expense deductions for any portion of the expenses relating to their personal residence for 2005, 2006, and 2007. We disallow the business expense deductions relating to petitioners' personal residence as follows: for 2005, alarm services in full; for 2006, alarm services, utilities, and taxes in full, and interest and insurance to the extent related to the residence; and for 2007, alarm services and utilities in full, and repairs, taxes, interest, and insurance to the extent related to the residence. See infra Appendix A. We address the remaining interest, repairs, and insurance deductions not related to the personal residence below.

[*67]        2.        Manitou House

Petitioners also deducted expenses relating to the Manitou house as business expense deductions.  See infra Appendix C.  They deducted these expenses primarily on Schedules C-2 and deducted a limited number on Schedules C-1 and SRI's or PPI's S corporation tax returns.  See infra Appendix C.  Respondent argues that the expenses relating to the Manitou house were nondeductible personal expenses.  We agree.  Petitioners' son used the house as his residence, and petitioners attempted to create a rental arrangement to deduct his personal living expenses.  The son was an employee of PPI and did not have a written employment contract.  Petitioners have not established that their son was required to live in the homes as a condition of his employment.  See sec. 119.  PPI maintained an office elsewhere.  Petitioners argue that their son used a room exclusively for business purposes.  They did not provide sufficient information relating to the size of the room allegedly used for business purposes and instead deducted 100% of the expenses relating to the house.  Although the son performed services to renovate the homes, this alone does not make his living expenses 100% deductible.  Furthermore, they did not establish that their son used any portion of the house regularly and exclusively as a home office.  We disallow the deductions relating to the Manitou house as set forth in Appendix C.  After concessions, we

[*68] sustain respondent's determinations to disallow the deductions on Schedules C-2 for 2005, 2006, and 2007 in their entirety.  See infra Appendix B.

### 3. Interest

Petitioners deducted interest expenses on their Schedules C-1 for 2005, 2006, and 2007.[28]  See infra Appendix A.  Personal interest is generally not deductible.  Sec. 163(h)(1).  Nondeductible personal interest is defined as any interest other than six listed categories of deductible interest expenses.  Sec. 163(h)(2).  Taxpayers must establish that the interest is within one of the enumerated categories.  Interest that is "paid or accrued on indebtedness properly allocable to a trade or business" is deductible.  Sec. 163(h)(2)(A).  Petitioners contend that they incurred the interest expense for 2005 to finance Sugarloaf and SRI's development of the subdivision and for 2007 to finance the PTI litigation and the construction of two houses on the SRI lots.  They did not offer a business purpose for the 2006 interest expense.  They incurred a significant portion of the 2005 interest on loans against life insurance policies and incurred approximately $3,000 on multiple credit cards.  They have not established the amounts of the loans against their insurance policies and have not attempted to allocate the debt

---

[28]Petitioners seek to shift 50% of the home mortgage interest reported on their 2005 Schedule A to Schedule C-1 on the basis of a home office deduction. They are not entitled to such a deduction.

**[*69]** according to its alleged use. For 2005 they provided canceled checks and QuickBooks entries to substantiate the payments to the insurance companies. There is no evidence establishing that the payments were for premiums, interest, or a loan repayment. The minimal policy documentation provided lists the interest as unpaid. With respect to the credit card interest, petitioners used the credit cards for both personal and business expenses, and they did not attempt to allocate the interest as personal or business. For 2006 and 2007 they did not provide any records of payments or a business purpose. We have no way to establish the amount of the interest paid or to estimate the deductible portion of the interest. Vanicek v. Commissioner, 85 T.C. at 742-743. Accordingly, we find that petitioners failed to substantiate the payment and business purpose of the interest expense deductions, and we sustain respondent's determinations in their entirety. See infra Appendix A.

4. Insurance

Petitioners deducted insurance expenses for automobiles that they and their son used for personal reasons, the Manitou house, jewelry and other personal property, and an umbrella policy. See infra Appendix A. They provided QuickBooks records and canceled checks to substantiate the insurance expenses. With a few exceptions, they did not provide insurance policies or billing

[*70] statements to substantiate the business purpose or the amounts of the insurance expenses.  We find that they have failed to adequately substantiate the amounts and/or the business purpose of the insurance expenses.  See secs. 162, 212; Edgar v. Commissioner, T.C. Memo. 1979-524.  Accordingly, after concessions, we disallow the insurance deductions as set forth in Appendix A.

### 5.    Business Gifts

Taxpayers are entitled to deduct the cost of business gifts limited to $25 per recipient per year.  Sec. 274(b)(1).  They must substantiate the cost and description of the gift, the date that the gift was made, the business reason for the gift, and the business relationship between the taxpayer and the recipient.  Sec. 1.274-5T(b)(5), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).  Petitioners deducted $800 in business gifts for 2006.  See infra Appendix A.  We are satisfied that they adequately substantiated four business gifts of at least $25 and are entitled to deduct $100 in business gifts for 2006.  We disallow the remaining business gift deduction for 2006.  See infra Appendix A.

### 6.    Travel and Meal Expenses

Petitioners deducted travel and meal expenses as set forth in Appendix A. Petitioners deducted travel and meal expenses relating to Mr. Rogers' employment with Seyfarth Shaw and his various business activities, including PTI and

[*71] Sugarloaf. They also deducted travel expenses for Mrs. Rogers to accompany her husband on business trips and did not establish a business purpose for her travel. During 2005, 2006, and 2007 Mr. Rogers' status as a partner at Seyfarth Shaw affects his entitlement to deduct expenses relating to his legal work on Schedules C. For 2005, 2006, and 2007 portions of the deducted travel expenses related to Seyfarth Shaw and, for 2006 and 2007, meal expenses. See infra Appendix A. He also deducted car rental expenses related to his work with his law partnership, including an expense listed as "rent" for 2005 and possibly a portion of the expense listed as "automobile" for 2007. See infra Appendix A.

Travel and meal expenses are subject to the strict substantiation requirements of section 274(d) discussed above. See Shea v. Commissioner, 112 T.C. at 186-187. Section 274(n) limits the deduction for certain meal expenses to 50% of the expense. We find that petitioners have failed to substantiate the time, the place, or the business purpose of the expenses through adequate records that satisfy the strict substantiation requirements of section 274(d) for any of the travel, meal, or automobile expenses deducted for 2005 through 2007 or 2009 as set forth in Appendix A. Accordingly we disallow the expenses in their entirety. See infra Appendix A.

**[\*72]** Furthermore, petitioners deducted substantial expenses for 2005 through 2007 that related to Mr. Rogers' legal services at Seyfarth Shaw. Generally, a partner may not directly deduct expenses of the partnership on his individual return even if he incurred the expenses in furtherance of the partnership's business unless there is an agreement with the partnership or a regular routine that requires the partner to use his own funds to pay the expenses. Cropland Chem. Corp. v. Commissioner, 75 T.C. 288, 295 (1980), aff'd without published opinion, 665 F.2d 1050 (7th Cir. 1981); Klein v. Commissioner, 25 T.C. 1045, 1051-1052 (1956). Seyfarth Shaw's reimbursement policy provided for reimbursement of a substantial portion of Mr. Rogers' travel, meal, and automobile expenses. Petitioners have not identified any specific expenditures for which Seyfarth Shaw denied reimbursement. They claim that he did not seek reimbursement and treated his payment of his own travel and automobile expenses as a contribution to the partnership. However, his right to reimbursement under the firm's policy, not actual reimbursement, prohibits his deducting the reimbursable travel and automobile expenses. Where a partner has a right to an expense reimbursement but elects not to seek reimbursement, the partner is not entitled to deduct the expense. McLauchlan v. Commissioner, 558 F. App'x 374, 379 (5th Cir. 2014), aff'g and remanding on another issue T.C. Memo. 2011-289. Otherwise the

[*73] taxpayer could convert a partnership expense into a deduction for himself by deciding not to seek reimbursement. See Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986) (disallowing an employee's deduction for a reimbursable employee expense), aff'g T.C. Memo. 1984-533. Petitioners further argue that they included any reimbursements that Mr. Rogers received in their income but have not offered any documentation to support their claim. Accordingly, petitioners would not be entitled to deduct travel or automobile expenses to the extent they relate to Mr. Rogers' activities at Shaw Seyfarth for 2005, 2006, and 2007 if they had satisfied the section 274(d) substantiation requirements.

       7.    Automobile Use

Petitioners deducted expenses relating to their automobiles that either they or their adult son used for 2007 and possibly a portion of the deductions for insurance and repairs for 2006 and 2007. See infra Appendix A. Petitioners are not entitled to deduct any portions of these expenses because they failed to satisfy the strict substantiation requirements of sections 274(d) and 280F(d)(4). See sec. 1.274-5T(b)(6), Temporary Income Tax Regs, supra. Petitioners failed to maintain adequate records of their business versus personal use and did not provide sufficient proof of: (1) the amount of each separate expense, (2) the date of each expense, and (3) the business purpose of each expense. See id. Mr. Rogers

[*74] admitted that he used his vehicle for commuting to Seyfarth Shaw's office for 2005 through 2007 and deducted commuting expenses. See sec. 1.162-2(e), Income Tax Regs. The records provided are not reliable or complete and do not adequately establish the business use of the vehicles. Nor do we find the witnesses' testimony to be credible. We disallow the deductions as set forth in Appendix A.

### 8. Legal and Professional Fees

Petitioners deducted legal and professional fees on their Schedules C-1 for 2006, 2007 and 2009, as set forth in Appendix A, relating to PTI's patent infringement issues, tax issues, Mr. Rogers' activities to promote the Sugarloaf tax shelter for 2006, and for subsequent years, disputes arising from his Sugarloaf activities, including a malpractice lawsuit arising from the Sugarloaf transaction for which Mr. Rogers received partial reimbursement. Petitioners provided sufficient evidence to substantiate the legal fees deducted on Schedules C-1 for 2006, 2007, and 2009, to the extent shown in Appendix A. They incurred significant legal expenses with respect to their business activities. The Court may estimate the amount of deductible legal fees. Vanicek v. Commissioner, 85 T.C. at 742-743. Petitioners provided QuickBooks records and canceled checks. They also provided invoices that substantiate significant portions of the legal fees. For

**[*75]** 2006 and 2007 petitioners deducted legal fees that were personal or for which they failed to establish a business purpose, including legal fees relating to a real estate assessment on their personal residence, an estate case, a laptop fire, and significant fees paid to Seyfarth Shaw. In addition, petitioners did not substantiate payment of the expenses through either QuickBooks entries or canceled checks for a portion of the invoiced expenses, and they are not entitled to deduct those expenses. For 2006 and 2007 they paid approximately 15% and 30% of the deducted legal fees to Seyfarth Shaw, respectively, and did not provide invoices or other documentation to establish the business purpose for the payments. For 2006 and 2007 petitioners are entitled to deduct legal fees as set forth in Appendix A, and we disallow the remainder for the reasons stated.

For 2009 petitioners provided sufficient evidence to substantiate the deduction of legal fees as recorded in their QuickBooks entries, taking into account respondent's argument that they received reimbursement for a portion of their expenses relating to the malpractice lawsuit. For 2009 petitioners deducted legal fees that exceed the amount entered into petitioners' QuickBooks records, and we disallow the excess amount. See infra Appendix A.

**[*76]**      9.      <u>Substantiation of Expenses</u>

At issue for a significant portion of the disputed deductions is the substantiation of the payment of the expenses and their business purpose. We find that petitioners have adequately substantiated the entire amount of the returns and allowances deducted for 2009 that relate to the deduction of uncollected legal fees for services rendered by Rogers & Associates. They have also sufficiently substantiated the expenses for computer services for 2006 in full, publications of $1,509 for 2006, and dues and subscriptions of $1,272 for 2006, and supplies of $1,865 for 2007. <u>See</u> <u>infra</u> Appendix A. In general, petitioners presented QuickBooks entries, credit card statements, and canceled checks to substantiate these expenses. With a few exceptions, they did not provide invoices or receipts. The 2006 computer services deduction included the costs of business software, real estate software, and computer repair services. A significant portion of the disallowed 2006 publication expenses was for newspaper and magazine subscriptions and book store purchases, for which petitioners did not establish a business connection. We are satisfied that the documentation provided, petitioners' business history, and their testimony allow us to estimate the

**[\*77]** deductible portion of the disputed expenses pursuant to the <u>Cohan</u> rule as set forth in Appendix A.[29]

After concessions, we find that petitioners failed to establish the amounts and/or business purpose of the remainder of the publications and the dues and subscriptions for 2006 and the supplies for 2007, and failed to establish the expenditure and/or the business purpose of the entire amounts of the following expenses:  for 2006, repairs, office expense, depreciation, taxes and licenses, fees, miscellaneous, and bank service charges, and for 2007, repairs.  In addition, they did not establish that the expenses were ordinary and necessary.  <u>See</u> sec. 162.  They failed to present any evidence relating to the 2006 depreciation deduction.  For the disallowed deductions, petitioners presented QuickBooks entries, credit card statements, and canceled checks.  They used the credit cards and bank accounts for both personal and business purposes and failed to adequately distinguish the business versus personal uses.  The bank service charges included interest charges and late payment fees for credit cards, wire transfer fees, and overdraft fees on their personal bank accounts.  For office expenses, they relied on QuickBooks entries for purchases at office supply stores, credit card statements,

---

[29]Respondent has not argued that these expenses should be treated as nonreimbursable partnership expenses on the basis of Mr. Rogers' partner status at Seyfarth Shaw.

[*78] and canceled checks for the portion of the disallowed expenses and failed to adequately substantiate the business purpose of the expenses.

For 2006 petitioners deducted $1,000 as a separate entry for legal fees and $1,000 for fiduciary expenses. Both expenses relate to Mr. Rogers' investment in the Sugarloaf tax shelter. See discussion supra part II.A.2 in the findings of fact relating to the granting of respondent's motion for partial summary judgment on the Sugarloaf deductions. We find that petitioners are not entitled to deduct either expense as both relate to an abusive tax shelter. See Kenna Trading, LLC v. Commissioner, 143 T.C. at 365.

D.    Deductions Relating to SRI's Activities

Respondent disallowed deductions SRI claimed for 2005 and 2006. For 2005 respondent contends that SRI is not entitled to deduct a fee for a letter of credit and an architect's fee related to the subdivision project but instead must treat them as capital expenditures. For 2006 he disallowed business expenses deductions as set forth in Appendix D because of a lack of substantiation and a failure to establish a business purpose. Respondent concedes that SRI is entitled

**[\*79]** to deduct the consulting fee paid to PPI on the basis of our decision above

that PPI must include that amount in its gross receipts for 2006.[30]

### 1.     2005 Letter of Credit Fee

SRI deducted $23,935 in 2005 for charges relating to a letter of credit for

the development of Orland Park.  It obtained the letter of credit to ensure funding

for infrastructure within the subdivision.  The municipality required a guaranty

that SRI had funding for infrastructure improvements that met the municipality's

satisfaction. Respondent argues that SRI must capitalize the letter of credit fee

because it related to improvement costs for Orland Park.  See sec. 263.  Petitioners

equate the letter of credit, which required an annual renewal, with a premium for

an insurance policy and argue that it is a deductible business expense.  Taxpayers

are required to capitalize the costs incurred for permanent improvements or

betterments to property.  Sec. 263(a)(1).  In general, these costs include

expenditures that add to the value of the property, substantially prolong the life of

the property, or adapt the property to a new or different use.  Sec. 1.263(a)-1(b),

---

[30]On brief petitioners assert that SRI is entitled to deduct $1.11 million as compensation to its business partner for an alleged bargain sale of six lots to the partner.  The partner paid $450,000 for the six lots with an alleged  fair market value of $1.56 million.  The compensation deduction is a new issue that was not raised before trial, and we will not consider it.  Dirico v. Commissioner, 139 T.C. at 416.  Respondent contends that petitioners' position would result in higher tax.

**[*80]** Income Tax Regs.; see INDOPCO, Inc. v. Commissioner, 503 U.S. at 87-89 (requiring capitalization where the expenditure produces a significant future benefit); Commissioner v. Lincoln Sav. & Loan Ass'n, 403 U.S. at 354 (requiring capitalization where the expenditure creates or enhances a separate and distinct asset). Taxpayers are required to capitalize both direct and indirect costs. Sec. 263A. We have described a letter of credit as follows:

> When a bank issues a letter of credit, the bank commits to provide funds when and if certain specified events occur. See Chase Manhattan Bank v. Equibank, 550 F.2d 882, 885 (3d Cir. 1977); Chapman v. United States, 527 F. Supp. 1053 (D. Minn. 1981). It is not a loan, but rather a commitment to make a loan. * * *

Willamette Indus., Inc. v. Commissioner, 92 T.C. 1116, 1124 (1989), aff'd, 149 F.3d 1057 (9th Cir. 1998). Generally, the cost of obtaining a loan is a capital expenditure, and the cost is deducted over the life of the loan. Cagle v. Commissioner, 63 T.C. 86, 97 (1974), aff'd, 539 F.2d 409 (5th Cir. 1976); Enoch v. Commissioner, 57 T.C. 781, 794-795 (1972). An expenditure may be deductible in one setting but may require capitalization in a different setting if incurred in connection with a capital asset. Lychuk v. Commissioner, 116 T.C. 374, 388 (2001). SRI was required to obtain the letter of credit as part of the subdivision's development. SRI did not draw on the letter of credit. Nevertheless SRI incurred the fee in connection with the construction of the Sterling Ridge

**[\*81]** subdivision.  The letter of credit fee is a cost of construction and is a capital expenditure.[31]

### 2. Architect's Fee

SRI deducted an architect's fee of $6,340 in 2005 for the design of a model home for Orland Park.  Petitioners contend that SRI is entitled to a loss deduction for the architect's fee because it abandoned the design plan.  Respondent argues that SRI is not entitled to a loss deduction because (1) petitioners failed to establish that SRI abandoned the plans and (2) the fee was incurred by PPI, not SRI, and was a capital expenditure of PPI.  PPI engaged the architecture firm and was billed for its services.  Petitioners did not identify the payor of the expense in the record.  Section 165(a) provides for a deduction of any loss sustained during the tax year and not compensated for by insurance or otherwise.  The loss must be evidenced by a closed and completed transaction, fixed by identifiable events.  Sec. 1.165-1(b), Income Tax Regs.  Taxpayers may deduct a loss incurred when property is permanently discarded from use or its usefulness terminates.  Sec. 1.165-2(a), Income Tax Regs.  This includes the costs incurred for architecture

---

[31]The parties did not address the relevant period for capitalization with respect to the letter of credit fee.  In general taxpayer must deduct the cost of obtaining a loan over the life of the loan.  Cagle v. Commissioner, 63 T.C. 86, 97 (1974), aff'd, 539 F.2d 409 (5th Cir. 1976).  SRI did not draw on the letter of credit, and the fee is not a cost of a loan.

[*82] plans if they abandon the plans, do not use the plans, and do not modify the plans to create a new plan. Moore v. Commissioner, 19 B.T.A. 140 (1930); see also Haspel v. Commissioner, 62 T.C. 59 (1974) (expenses for discharged architect's fees not deductible where part of plan was used). To be eligible for an abandonment loss, the taxpayer must establish an intention to abandon the asset and an affirmative act of abandonment. Citron v. Commissioner, 97 T.C. 200, 208-209 (1991).

Petitioners have not established that either PPI or SRI abandoned the architecture plans as required for a section 165 loss deduction. They did not provide a copy of the plans. PPI built three custom homes within the subdivision. Petitioners did not establish that the plans were not used in any way in the constructed homes. The only evidence provided was Mr. Rogers' self-serving testimony. In the construction industry, extra expenses due to errors or changes in planning or design are part of the builder's costs. FRGC Inv., LLC v. Commissioner, T.C. Memo. 2002-276, slip op. at 16, aff'd, 89 F. App'x 656 (9th Cir. 2004). Accordingly, neither SRI nor PPI is entitled to deduct the architect's fee under section 162. Respondent concedes that the architect's fee is a capital expenditure under section 263 and PPI may capitalize the fee as part of the cost of the homes that it sold pursuant to section 263A.

**[\*83]**     3.     <u>SRI's 2006 Business Expense Deductions</u>

Respondent disallowed numerous business expense deductions claimed on SRI's 2006 S corporation tax return. Many of the disallowed business expenses relate to amounts paid to or on behalf of petitioners' adult son, including rent, utilities and other expenses for the Manitou house, automobile expenses, and miscellaneous payments to their son to reimburse him for expenses that he allegedly paid on SRI's behalf. <u>See</u> <u>infra</u> Appendix D. As discussed <u>supra</u> part II.C.2, SRI is not entitled to deduct rent or utilities for the Manitou house, and we disallow the deductions in full. <u>See</u> <u>infra</u> Appendix D. Nor may SRI deduct the $2,000 automobile expense or the depreciation deduction for three automobiles reportedly placed in service in 2005 or 2006 because petitioners did not satisfy the strict substantiation rules of section 274(d). <u>See</u> <u>infra</u> Appendix D; <u>see also</u> sec. 274(d); sec. 1.274-5T, Temporary Income Tax Regs., <u>supra</u>. SRI deducted interest paid on the purported installment loan from Mrs. Rogers' transfer of Orland Park to SRI. As we have recharacterized the transfer as a capital contribution, SRI is not entitled to the interest expense deduction.

Petitioners failed to adequately substantiate the business purpose and amounts of deductions for the bank service charges, employee bonuses and reimbursements, insurance, telephone, parking, meals and entertainment, and

[*84] miscellaneous expenses, which we disallow in their entirety. See infra Appendix D. Generally they provided QuickBooks entries, canceled checks, credit card statements, and bank statements that do not establish a business purpose for the expenditures. They did not provide receipts, invoices, or other documentation such as insurance policies, to substantiate the business purpose or that the amounts were ordinary and necessary. The record indicates that some of these amounts were personal expenses, such as commuting expenses. SRI paid the employee bonus and a substantial portion of the reimbursements and miscellaneous expenses to petitioners' adult son. There is no indication that SRI reported the bonus as income to the son. He was an employee of PPI, not SRI. For the reimbursements paid to their son, they provided QuickBooks entries and canceled checks written to their son without any supporting documentation and did not adequately substantiate the business purpose for the reimbursed expenses. SRI paid the legal fees in connection with the development of the subdivision. Petitioners presented sufficient evidence to substantiate the legal expenses, and SRI is entitled to deduct the legal fees in full.[32] See infra Appendix D.

---

[32]Respondent did not argue that SRI should be required to capitalize the legal fees.

**[\*85]** E  <u>L&R Deductions</u>

L&R deducted travel expenses of $50,543 and $39,741 on its S corporation tax returns for 2005 and 2006, respectively. Petitioners did not comply with the substantiation requirements of section 274(d). They provided QuickBooks entries, canceled checks, credit card statements, and in some cases receipts. They made factual assertions in their briefs to support the business purpose for some of the travel expenses. Statements in the briefs do not constitute evidence and cannot supplement the record. <u>See</u> Rule 143(c). Mr. Rogers admitted that many of these expenses related to Sugarloaf, PTI, and his legal work as a partner at Seyfarth Shaw. L&R was a 20% shareholder in PTI. As explained above, any travel expenses relating to Seyfarth Shaw are nondeductible, reimbursable partnership expenses. L&R also deducted approximately $5,000 in expenses for Mrs. Rogers' travel, and petitioners did not establish a business purpose. Petitioners have not substantiated the time and place of the travel, the business reason for the travel, or the business purpose of the expenses. Mr. Rogers' self-serving testimony and noncontemporaneous documentation are insufficient to satisfy the rigorous standards of section 274(d). Accordingly, we find that L&R is not entitled to deduct the travel expenses for 2005 and 2006.

**[\*86]** F.     2006 Itemized Deductions

Respondent disallowed deductions on petitioners' 2006 Schedule A as follows:  State income tax and real estate tax of $11,745 relating to their personal residence, home mortgage interest of $4,659, and expenses from portfolio income of $1,770.  We find that petitioners have adequately substantiated these expenses and are entitled to the deductions.

G.     2005 Long-Term Capital Loss

Petitioners claimed a $53,550 long-term capital loss on their 2005 income tax return.  They concede all but $5,355, on the basis of a clerical error.  They argue that they have a $5,355 capital loss carryforward from 2004 arising from Jetstream.  Respondent argues that the loss arose in 2003 relating to the partnership Warwick Trading at issue in Superior Trading, LLC v. Commissioner, 137 T.C. 70.  Respondent argues that the loss would have passed through to petitioners as follows:  from Warwick Trading to Jetstream, from Jetstream to PPI, and from PPI to petitioners.  Respondent argues that the Court disallowed the losses to Warwick Trading in Superior Trading, and thus petitioners are not entitled to a passthrough loss.  Id. at 81-83, 92.  The Court does not have jurisdiction over the substantive issues concerning a passthrough loss from Warwick.  See sec. 6230(a)(2)(A).  The capital loss carryforward depends on the

[*87] decision in Superior Trading, and we will permit the parties to present evidence of that decision at a subsequent time.

H.     PPI's Deductions and Cost of Goods Sold

For 2005, 2006, and 2009 PPI deducted over $3 million in business expenses as set forth in Appendix E.[33]  With limited exceptions, we hold that petitioners have not substantiated the amounts or business purpose of the deducted expenses, and we sustain respondent's disallowance of the deductions.

1.     PPI's 2009 Cost of Goods Sold

PPI reported a cost of goods sold for 2009 of $1,435,711.  Petitioners conceded this amount and argue that PPI is entitled to an adjustment to gross receipts for the cost of goods sold of $141,781 on the basis of a mark to market adjustment for the unsold lots in the SRI subdivision under section 475.  PPI is not entitled to an adjustment for the cost of goods sold because it did not sell any property during 2009.  In addition, PPI is not entitled to a mark to market adjustment for the value of unsold homes.  Petitioners did not properly raise this

---

[33]Petitioners argue that the 2009 notice of deficiency is invalid because respondent failed to comply with the requirements of the Administrative Procedure Act, 5 U.S.C. sec. 500 et seq.  This argument is without merit.  See Alfieri v. Commissioner, 60 T.C. 296, 299 (1973), aff'd, 487 F.2d 1393 (2d Cir. 1973); Rintoul v. Commissioner, T.C. Memo. 1992-79, aff'd, 15 F.3d 1088 (9th Cir. 1994).

[*88] issue in their petition or at any time before trial and are precluded from doing so now. See Estate of Horvath v. Commissioner, 59 T.C. 551 (1953). Moreover, the section 475 mark to market accounting method does not apply to residential properties, and petitioners did not provide any evidence relating to the value of PPI's unsold property as of 2009.

### 2. PPI's Business Expense Deductions

PPI's business activities involved the Sterling Ridge subdivision and management services to Sugarloaf. Mr. Rogers also used PPI to pay for PTI's expenses including inventory and legal fees. PPI was not a shareholder of PTI. Petitioners also used PPI to pay many of their son's personal living expenses, including housing, automobile, and medical care. Mrs. Rogers paid expenses from her personal bank account that PPI deducted on its 2009 S corporation tax return, including office supplies, repairs, telephone, and licenses.

### a. PTI Subsidy

In 2005 PPI paid $124,520 on PTI's behalf to its management company and its suppliers and deducted the payments as a business expense, labeling the deduction "PTI subsidy". Taxpayers are entitled to deduct expenses that are directly connected with and pertaining to the taxpayer's trade or business. Sec. 162; sec. 1.162-1(a), Income Tax Regs. Generally a taxpayer who pays another

[*89] person's expenses is not entitled to a business expense deduction as the expenses were not incurred in the payor's trade or business unless the payor paid the expense to protect or promote its own business. Lohrke v. Commissioner, 48 T.C. 679, 688 (1967); Columbian Rope Co. v. Commissioner, 42 T.C. 800, 815 (1964). There is no business relationship between PPI and PTI. Expenses relating to PTI were not directly connected with and did not pertain to PPI's trade or business. Rogers 2004. PPI paid these expenses on PTI's behalf because of their common owner, Mr. Rogers. The subsidy is not an ordinary and necessary business expense of PPI. Mr. Rogers caused PPI to pay PTI's expenses to protect his investment in PTI. Accordingly, PPI is not entitled to deduct expenses that it paid on PTI's behalf.

Rogers 2004 involved a similar situation. We considered two payments that Mr. Rogers made on PTI's behalf to ensure the manufacture and the distribution of the medical device. Id. at *12. We held that the payments were nondeductible capital contributions from Mr. Rogers to PTI because Mr. Rogers made the payments to fund PTI's continued operation to protect his investment in the company. Id. at *56-*57. We further held that PPI could not deduct the payments. Id. PTI experienced significant market competition from an alleged

[*90] infringer of its patent. Mr. Rogers believed that the only way that he would receive a payout from PTI was through the infringement case.

b.      Legal and Professional Fees

PPI deducted legal and professional fees for 2005, 2006, and 2009. See infra Appendix E.  Petitioners provided QuickBooks entries, canceled checks, bank statements, and invoices to substantiate the legal fees.  For 2005 Mr. Rogers implemented the Sugarloaf tax shelter through PPI and his law firm Seyfarth Shaw.  PPI deducted substantial amounts of legal fees for 2005 relating to the Sugarloaf tax shelter, which are not deductible as ordinary and necessary business expenses.  We estimate that approximately half of PPI's 2005 legal fees (approximately $447,000) relate to PTI's patent litigation.  Petitioners have established the payment and purpose of these expenses.  However we have previously held PPI is not entitled to deduct legal fees incurred with respect to PTI's patent matters.  See Rogers 2004, at *53-*55.  A taxpayer is entitled to deduct legal fees that are directly connected with or proximately related to its trade or business.  Sec. 1.162-1(a), Income Tax Regs.  We find that PPI is not entitled to deduct the legal fees except to the extent shown in Appendix E for 2005 and 2006 for the reasons stated above. PPI is entitled to deduct the legal fees for 2009 in

[*91] their entirety as petitioners have substantiated that PPI incurred significant legal fees involving tax issues.  See infra Appendix E.

   c. Multicred Fee

 PPI deducted $907,263 as "Multicred fee" for 2005.  Respondent concedes that PPI is entitled to deduct $90,000 of this amount that it paid to L&R and L&R reported as income.  Petitioners contend that PPI paid the remainder of the Multicred fee for the benefit of Sugarloaf.  However, the record shows  that PPI paid $100,000 to Mr. Rogers, and petitioners did not identify the recipients for $400,000 of the Multicred fee.  We have held that expenses relating to the Sugarloaf transactions are not deductible business expenses under section 162 as they relate to an abusive tax shelter.  Kenna Trading, LLC v. Commissioner, 143 T.C. at 365.  Accordingly, we disallow the remainder of the Multicred fee deduction.

   d. Medical Expenses

 PPI deducted doctor and dental expenses that it paid on behalf of petitioners' son in 2005.  PPI did not have a health insurance plan for its employees for the portion of 2005 that it paid the son's medical expenses.  It did not have a written dental or health plan for 2005 that met the requirements of section 105, which would exclude reimbursement of an employee's medical

[*92] expenses from the employee's income and allows the employer to deduct the payments. There is no evidence that the son included the 2005 reimbursements in his income or that PPI reported the amounts on his Form W-2, Wage and Tax Statement, as wages. Accordingly, PPI is not entitled to deduct the expenses. See infra Appendix E.

e.     Substantiation of Expenses

In addition to the above expenses, PPI deducted numerous expenses in dispute for lack of substantiation as to the amount or the business purpose. See infra Appendix E. In general, petitioners produced QuickBooks entries, canceled checks, and credit card statements to substantiate the expenses. The credit card statements show both business and personal expenses, and petitioners have not made an adequate effort to distinguish the expenses. For the most part, they have not established the business purpose of the expenses through invoices, receipts, insurance policy statements, or other relevant documentation or that the expenses are ordinary and necessary. We sustain respondent's determination as provided below.

For 2005 petitioners have failed to substantiate amounts or business purposes of the deductions for gasoline in accordance with the strict substantiation requirements of section 274(d), computer services allegedly incurred for web page

[*93] development, real estate software and an internet service provider, and repair expenses that relate to the Manitou house that we have held are nondeductible supra part II.C.2. See infra Appendix E.

For 2005 and 2006 PPI deducted travel and meal expenses under the following categories that are subject to the strict substantiation requirements of section 274(d): travel, taxis, meals, airfare, and hotel. See infra Appendix E. They provide QuickBooks records, credit card statements, and canceled checks to document the expenses. They failed to maintain contemporaneous logs or other adequate records that satisfy the section 274(d) requirements. To the extent any of PPI's travel expenses relate to PTI, the expenses are not PPI's business expenses to deduct. PPI allegedly incurred a portion of the travel expenses in connection with Mr. Rogers' implementation of the Sugarloaf transactions, and petitioners have failed to establish that the expenses were ordinary and necessary expenses incurred in a trade or business. Accordingly we disallow the above expenses in their entirety.

For 2006 petitioners did not substantiate the amount or the business purpose of the deductions for repairs that were incurred primarily for car washes and store purchases except to the extent provided in Appendix E. With respect to the repair deduction, petitioners did not provide receipts or invoices to establish the items

[*94] purchased or their business purpose. For 2006 we find that petitioners have sufficiently substantiated the deductions for insurance and employee benefits. See infra Appendix E. While their documentation is limited to QuickBooks entries and canceled checks, we find that they adequately substantiated the expenses in the light of their testimony and established business activities.

For 2009 petitioners have failed to substantiate the amount or business purposes for the deductions for: interest (which relates to credit card charges), taxes and licenses that appear to relate to their personal residence, bank service charges, miscellaneous, office, printing, "Brad Todd expenses" allegedly incurred for travel expense reimbursements, and rent paid for office space for Mr. Todd. See infra Appendix E. Nor have they substantiated insurance in excess of the amount that respondent conceded. We find that they have substantiated the amount and business purpose of deductions for repairs (relating to the unsold homes in the Sterling Ridge subdivision), a business license, parking, and accounting (the portion incurred for PPI) to the extent indicated in Appendix E and the employee benefit program in its entirety. See infra Appendix E. The remainder of the accounting expense was incurred for Sugarloaf, and petitioners have not shown that the expenses are ordinary and necessary expenses incurred in a trade or business. PPI also seeks an additional $5,000 deduction for salary and

[*95] wages in addition to respondent's concession.  Respondent argues that petitioners conceded the $5,000 as part of the settlement of the salary and wage deduction.  We agree.  Moreover, petitioners have not substantiated the payment or the business purpose of the amounts paid to the recipients of the disputed $5,000.

III.    Innocent Spouse Relief

Generally, spouses may elect to file a joint income tax return and are then held jointly and severally liable for the entire tax due for the tax year.  Sec. 6013(d)(3).  Under specific circumstances a spouse who filed a joint return may obtain relief from joint and several liability (innocent spouse relief) under section 6015.  Mrs. Rogers seeks innocent spouse relief under section 6015(b) or (f) for 2003, 2005, 2006, 2007, and 2009.  Petitioners litigated their tax liability for 2003 in Rogers 2003.  Mrs. Rogers filed a joint petition with her husband in that case and did not claim innocent spouse relief.  Petitioners paid the deficiency determined in that case, and Mrs. Rogers seeks a refund.  Respondent seeks additional assessments of income tax and a penalty for 2003 arising from the partnership-level proceeding in Superior Trading, LLC v. Commissioner, 137 T.C.

[*96] 70.[34]  He asserts that Mrs. Rogers is barred from seeking innocent spouse

relief for 2003 on the basis of the doctrine of res judicata.  Respondent further

asserts that with respect to the deficiency years (2005 to 2007 and 2009), Mrs.

Rogers is not entitled to innocent spouse relief.

A.     Tax Year 2003 and Doctrine of Res Judicata

Under the doctrine of res judicata, when a court of competent jurisdiction

enters a final decision on the merits of a cause of action, the parties to the action

are bound by every matter that was or could have been offered and received to

sustain or defeat the claim.  Commissioner v. Sunnen, 333 U.S. 591, 597 (1948);

see also Gustafson v. Commissioner, 97 T.C. 85, 91 (1991).  Federal income tax is

determined annually, with each year being a separate cause of action, and res

judicata is applied to bar subsequent proceedings involving the same tax year.

---

[34]Mrs. Rogers argues that respondent is barred from asserting the additional
assessment for 2003 on the basis of the doctrines of estoppel, res judicata, and
laches and the statute of limitations.  We find her arguments to be without merit.
The Court lacked jurisdiction in the deficiency case for 2003 to consider the
partnership items at issue in Superior Trading, LLC v. Commissioner, 137 T.C. 70
(2011).  Superior Trading, LLC v. Commissioner, T.C. Memo. 2012-110; see secs.
6221 through 6231.  The Court's Opinion in the deficiency case for 2003 did not
address any of the partnership items and did not resolve any potential assessment
from Superior Trading.  See Rogers 2003.  The parties have stipulated that the
correctness of the additional tax assessment rising from Superior Trading is not at
issue in these cases.  Moreover, petitioners have not established they were
improperly denied a collection due process hearing relating to the 2003
partnership adjustments.

[*97] Commissioner v. Sunnen, 333 U.S. at 597-598.  Common law principles of res judicata generally bar a party to a prior proceeding for the same tax year from seeking relief from joint and several liability regardless of whether the party raised the claim in the prior proceeding.  Vetrano v. Commissioner, 116 T.C. 272, 280 (2001), supplementing T.C. Memo. 2000-128.  Section 6015(g)(2) modifies the common law doctrine of res judicata with respect to claims for innocent spouse relief.  Under section 6015(g)(2), res judicata does not bar a taxpayer from requesting innocent spouse relief under section 6015(b), (c), or (f) if:  (1) relief from joint and several liability under section 6015 was not an issue in the prior proceeding and (2) the spouse seeking relief did not participate meaningfully in the prior proceeding.  Innocent spouse relief was not an issue in the deficiency case for 2003; the first factor is satisfied.  Mrs. Rogers argues that she did not have an opportunity to meaningfully participate in the deficiency case for 2003 and should not barred from raising innocent spouse relief for 2003 here.  The taxpayer bears the burden of proving that she did not participate meaningfully in the prior proceeding.  See Deihl v. Commissioner, 134 T.C. 156, 162 (2010).

Meaningful participation is not defined in section 6015(g)(2) or the accompanying regulations.  Generally, we look to the totality of the facts and circumstances to determine whether a taxpayer meaningfully participated in a prior

[*98] proceeding. Harbin v. Commissioner, 137 T.C. 93, 98 (2011); see also

Deihl v. Commissioner, 134 T.C. at 162. Specific acts such as signing court

documents, participating in settlement negotiations, exercising control over the

handling of the prior proceeding, and having the opportunity to raise an innocent

spouse claim in the prior proceeding are indicators of meaningful participation.

Harbin v. Commissioner, 137 T.C. at 98; Monsour v. Commissioner, T.C. Memo.

2004-190, slip op. at 34-35; see also sec. 1.6015-1(e), Income Tax Regs.

However, "merely compl[ying]" with a spouse's instructions to sign pleadings and

other documents in the prior proceeding is not conclusive of meaningful

participation. Thurner v. Commissioner, 121 T.C. 43, 53 (2003). A taxpayer does

not meaningfully participate where the totality of the evidence demonstrates that

she was not fully informed or engaged in the litigation. Deihl v. Commissioner,

134 T.C. at 165. The taxpayer's level of education and sophistication and her

knowledge or understanding of the activities giving rise to the deficiency are

relevant factors. Cf. Harbin v. Commissioner, 137 T.C. at 98 (deficiency arose

from taxpayer's spouse's gambling activity, of which he had no knowledge); Deihl

v. Commissioner, 134 T.C. at 163 (taxpayer had little formal education and did not

review or sign any court documents); Monsour v. Commissioner, T.C. Memo.

2004-180 (taxpayer was an attorney and signed a stipulated decision). The fact

[*99] that the taxpayer was represented by counsel and communicated with counsel at the prior proceeding is an indication of meaningful participation. Deihl v. Commissioner, 134 T.C. at 164 (taxpayer's counsel in the prior proceeding communicated exclusively with her spouse regarding the litigation).

Mrs. Rogers contends that she did not meaningfully participate in the deficiency case for 2003. She was represented by counsel and sat at the table reserved for petitioners and their counsel throughout the trial although she was not called as a witness. Her level of education and business experience establish that she understood the proceedings and the implications of the Court's decision. She has a J.D. and an M.B.A. and has taken multiple courses in tax and accounting. She argues that she did not understand the issues involved in the proceedings and does not understand financial documents. She claims that she had no knowledge of her husband's business activities or the tax shelter that he promoted. We do not find her claims credible. There is nothing in the record to show that she did not have an opportunity to consult with her counsel before and during the trial, and she has not provided any other evidence to establish her lack of participation in the deficiency case for 2003. We find that Mrs. Rogers meaningfully participated in

**[\*100]** that case and is barred by the doctrine of res judicata from raising an innocent spouse claim for 2003.[35]

B.     Innocent Spouse Relief for Deficiency Years

For the deficiency years (2005 through 2007 and 2009), Mrs. Rogers seeks innocent spouse relief under section 6015(b) and (f).

1.     Section 6015(b)

Section 6015(b) requires a taxpayer seeking innocent spouse relief to satisfy five conditions:  (1) a joint return was filed, (2) the understatement of tax is attributable to erroneous items of the taxpayer's spouse, (3) the requesting spouse establishes that when signing the return, she did not know, and had no reason to know, that there was an understatement, (4) taking into account all the facts and circumstances, it is inequitable to hold the requesting spouse liable for the deficiency, and (5) the taxpayer timely elects innocent spouse relief under section 6015(b).  These five conditions are conjunctive; the failure to satisfy any one

---

[35]A taxpayer requesting innocent spouse relief is entitled to a refund only with respect to payments made with funds provided by the requesting spouse. Rev. Proc. 2013-34, sec. 4.04, 2013-43 I.R.B. 397, 403; see Ordlock v. Commissioner, 126 T.C. 47, 61 (2006) (holding an innocent spouse is not entitled to a refund from an overpayment made from community property), aff'd, 533 F.3d 1136 (9th Cir. 2008).  Mrs. Rogers argues that she paid the 2003 deficiency with her personal funds, but she has not presented documentation relating to the source of the payment.  Accordingly, she would not be entitled to a refund irrespective of our decision that she is barred by res judicata from raising innocent spouse relief.

[*101] condition precludes relief under section 6015(b). Haltom v. Commissioner, T.C. Memo. 2005-209. Respondent concedes that Mrs. Rogers satisfies conditions (1), (2), and (5). See sec. 6015(b)(1)(A), (B), (E). He maintains that she does not satisfy condition (3), that she did not know or have reason to know of the understatement when she signed the returns, and condition (4), that it would be inequitable to hold her liable for the deficiencies. See sec. 6015(b)(1)(C) and (D). Mrs. Rogers has the burden to establish that she is entitled to section 6015(b) relief.[36] See Rule 142(a)(1).

### a. Knowledge Requirement

To qualify for section 6015(b) relief, a requesting spouse cannot have had actual knowledge or a reason to know of the understatement at the time she signed the joint return. Sec. 6015(b)(1)(C). Generally, a requesting spouse has reason to know of the understatement if she has reason to know of the transaction that gave rise to the understatement. Jonson v. Commissioner, 118 T.C. 106, 115 (2002), aff'd, 353 F.3d 1181 (10th Cir. 2003). The Court of Appeals for the Seventh Circuit, to which these cases are appealable, has adopted a more lenient approach

---

[36]Throughout their briefs petitioners argue that respondent has the burden of proof on various issues, including Mrs. Rogers' sec. 6015 relief. They do not provide an explanation to support a shift in the burden of proof to respondent, and we find no reason to shift the burden of proof.

**[*102]** in cases where the understatement results from improper deductions (versus cases involving unreported income). Resser v. Commissioner, 74 F.3d 1528, 1536 (7th Cir. 1996) (quoting Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989)), rev'g and remanding T.C. Memo. 1994-241. According to the Court of Appeals for the Seventh Circuit, the requesting spouse must establish that she did not know or have reason to know that the erroneous deduction would give rise to an understatement. Resser v. Commissioner, 74 F.3d at 1536. The Court applies a reasonably prudent person standard to evaluate the requesting spouse's knowledge in cases involving both unreported income and erroneous deductions. Hopkins v. Commissioner, 121 T.C. 73, 77-78 (2003) (regarding improper deductions); Butler v. Commissioner, 114 T.C. 276, 283-284 (2000) (regarding unreported income). A spouse knew or had reason to know of an understatement if a reasonably prudent person in her position would have known that the return contained an understatement when she signed it. Resser v. Commissioner, 74 F.3d at 1535-1536; Butler v. Commissioner, 114 T.C. at 283. The reasonably prudent person standard also imposes a duty of inquiry on the requesting spouse. Resser v. Commissioner, 74 F.3d at 1541; Hopkins v. Commissioner, 121 T.C. at 77-80; Butler v. Commissioner, 114 T.C. at 283-284. For understatements resulting from improper deductions, the requesting spouse has reason to know if she had

[*103] sufficient knowledge of the facts underlying the deductions such that a reasonably prudent person in her position would question seriously whether the deductions were erroneous.  Resser v. Commissioner, 74 F.3d at 1536 (quoting Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), aff'g T.C. Memo. 1988-63).  In applying the reasonably prudent person standard, we consider four factors:  (1) the spouse's level of education, (2) her involvement in the financial and business activities of the family, (3) the presence of unusual or lavish expenses beyond the family's norm, and (4) the nonrequesting spouse's evasiveness or deceitfulness about the family's finances.  Resser v. Commissioner, 74 F.3d at 1536.  No single factor is controlling.  Each of these four factors weighs against Mrs. Rogers.

Mrs. Rogers is highly educated and has multiple advanced degrees, including a J.D. and an M.B.A.  She took tax law courses in law school.  She was capable of understanding complex financial, accounting, and tax concepts.  Despite her education, she claims that she has only a nominal understanding of finance and no understanding of tax and accounting or basic financial statements such as income and loss statements, balance sheets, or bank statements.  She further maintains that she was not involved in petitioners' business activities and relied on her husband to handle such matters.  She claims that she had no

[*104] knowledge of her husband's businesses or law practice and was not involved in SRI's business activities. We find that her claims are not credible. She did not lack business experience as she claims. She managed and participated in significant business dealings, including planning and designing the Sterling Ridge subdivision, teaching herself property tax abatements and representing clients in abatement cases, and assisting with Rogers & Associates' office management. She was actively involved in the Sterling Ridge subdivision, including the planning and the supervision of the subdivision development. She assisted with designing the layout of the construction lots, park, and ponds and made sure the installation satisfied her instructions. She was involved with setting the sale terms and price for the construction lots; she has held a real estate license since 1967. We do not believe petitioners' claims that Mrs. Rogers was a passive investor in SRI and that Mr. Rogers made all the business decisions. She increased her involvement in petitioners' businesses during Mr. Rogers's extended hospitalization in 2009. She fired the office manager at Rogers & Associates and assumed the position herself. She maintained the firm's accounting records, endorsed and deposited checks, and paid expenses including payroll. Mrs. Rogers was able to run petitioners' businesses without major disruption. Furthermore, it is clear that Mrs. Rogers had knowledge of petitioners' finances. She actively

**[*105]** participated in both household finances and business activities throughout the years at issue. She endorsed checks and used Mr. Rogers' signature stamp for both personal and business reasons. She paid bills from her personal accounts, joint accounts, and accounts belonging to Mr. Rogers. She made deposits into petitioners' joint and individual bank accounts and had access to financial records.

Mrs. Rogers was aware of petitioners' financial and tax situation. We find her claims to the contrary are not credible. She reviewed their joint tax returns with her husband each year and asked questions. She was aware that they paid little or no income tax during the deficiency years despite the fact that her husband earned substantial amounts of income from his law practice from 2005 through 2007. She understood that they used losses from their business entities to offset their income. She knew that Mr. Rogers promoted the Sugarloaf transactions, and she understood the basic premise of the tax shelter, i.e., that investors would acquire large tax benefits from relatively low investments. See Rogers v. Commissioner, at *15. Mrs. Rogers engaged in a substantial residential development project through SRI of land that she inherited from her father and used the distressed debt tax shelter that her husband promoted to avoid paying income tax on a substantial portion of her income from that project. She knew or had reason to know that SRI sold lots in the subdivision for over $5 million but

[*106] reported losses of over $3.2 million, claiming a $4 million deduction from the Sugarloaf tax shelter. Mrs. Rogers' education and business experience weigh against her claim for section 6015(b) relief. See sec. 1.6015-2(c), Income Tax Regs.

Petitioners maintained a high standard of living through the years at issue. They traveled extensively to international and domestic destinations, purchased multiple luxury automobiles for themselves and their adult son, maintained memberships at multiple clubs, and financed many of their adult son's expenses. Mrs. Rogers argues that her standard of living during the years at issue was consistent with that of prior years and were not beyond the family's norm. She asks us to ignore the fact that her standard of living was high. Her standard of living does not support the granting of innocent spouse relief. Finally, there is nothing in the record that indicates Mr. Rogers tried to deceive or hide anything from Mrs. Rogers. He never concealed any financial dealings, bank accounts, or business operations from her. She had complete access to information about petitioners' financial situation. She reviewed the tax returns each year before signing them and asked her husband questions. She had access to their banks accounts, credit card statements, and other financial records and attended her husband's business dinners and meetings. On the basis of the four enumerated

[*107] factors, we find that Mrs. Rogers knew or had reason to know of the understatements of tax for the deficiency years and is not entitled to relief under section 6015(b).

### b.    Equity Requirement

Failing any one condition of section 6015(b) precludes the granting of innocent spouse relief. As we have found that Mrs. Rogers has failed the knowledge requirement, she is not entitled to section 6015(b) relief. Nevertheless, for completeness, we briefly address the other disputed requirement in these cases, whether it would be inequitable to hold Mrs. Rogers liable for the deficiencies. See sec. 6015(b)(1)(D). In analyzing the equity of imposing liability, we must consider all of the facts and circumstances including whether the requesting spouse significantly benefited from the understatement. Sec. 1.6015-2(d), Income Tax Regs. A significant benefit is any benefit in excess of normal support. Id. She traveled extensively with her husband, purchased luxury automobiles, and paid living expenses for her adult son that she improperly deducted. She purchased two homes for the alleged purpose of renovating and reselling them for a profit and allowed her adult son and his family to live in the homes rent free, paid living expenses on his behalf, and claimed improper deductions for the rent and living expenses. She made expensive purchases of clothing, jewelry, and

[*108] household items and maintained memberships at multiple private clubs.

Mrs. Rogers was aware that petitioners earned substantial income, including

approximately $13 million from the sale of the subdivision lots and an annual

income of approximately $500,000 from Mr. Rogers' law firm for 2005 through

2007, and paid little or no income tax. As discussed above, Mrs. Rogers had

access to financial records, reviewed the returns with her husband, and asked him

questions about the returns. There is no evidence of deceit or concealment by Mr.

Rogers that would make holding Mrs. Rogers jointly and severally liable for the

deficiencies inequitable. Accordingly, Mrs. Rogers has not satisfied the equity

requirement of section 6015(b), a second reason that she is not entitled to section

6015(b) relief.

### 2. Equitable Relief Under Section 6015(f)

Mrs. Rogers also seeks innocent spouse relief under section 6015(f).

Section 6015(f) provides an alternative means for innocent spouse relief for a

requesting spouse who does not otherwise qualify for relief under section 6015(b)

or (c).[37] Sec. 6015(f)(2). Section 6015(f) provides for relief from joint and several

liability if it is inequitable to hold the requesting spouse liable for any unpaid tax

---

[37]Mrs. Rogers does not qualify for relief under sec. 6015(c) because petitioners remain married.

**[*109]** or any deficiency (or any portion thereof) after taking into account all the facts and circumstances of the case. Sec. 6015(f)(1). Except as otherwise provided in section 6015, the taxpayer bears the burden of proving that she is entitled to section 6015 relief. Rule 142(a). Both the scope and standard of review in cases requesting relief from joint and several liability are de novo. Porter v. Commissioner, 132 T.C. 203, 210 (2009). Rev. Proc. 2013-34, 2013-43 I.R.B. 397, modifying and superseding Rev. Proc. 2003-61, 2003-2 C.B. 296, sets forth a three-step procedure for evaluating requests for innocent spouse relief: (1) a list of seven threshold requirements that a requesting spouse must satisfy to be eligible for relief (threshold test),[38] (2) a three-part test for a streamlined determination to grant relief, and (3) if the taxpayer is not entitled to a streamlined determination, a nonexclusive list of factors that the IRS will consider in determining whether it would be inequitable to hold the spouse jointly and

_____

[38]The seven threshold conditions are: (1) the parties filed a joint return, (2) relief is not otherwise available under sec. 6015, (3) the claim for relief is timely, (4) no assets were transferred between the spouses as part of a fraudulent scheme, (5) the nonrequesting spouse did not transfer disqualified assets to the requesting spouse, (6) the requesting spouse did not knowingly participate in the filing of a fraudulent joint return, and (7) absent certain exceptions, the income tax liability is attributable, in full or in part, to an item of the nonrequesting spouse or an underpayment resulting from the nonrequesting spouse's income. Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. 397, 399.

[*110] severally liable.[39] Mrs. Rogers does not qualify for a streamlined determination because streamlined relief requires that the taxpayers be no longer married. Id. sec. 4.02, 2013-43 I.R.B. at 400. Generally, the requesting spouse bears the burden of proof. Rule 142(a).

### a. Threshold Test for Section 6015(f) Relief

Three of the seven requirements of the threshold test are at issue here. Respondent contends that since as early as 1995 petitioners have engaged in a pattern of transferring assets into Mrs. Rogers' name that causes her to fail two conditions of the threshold test: (1) that there were no asset transfers as part of a fraudulent scheme and (2) that there was no transfer of disqualified assets to Mrs. Rogers. See Rev. Proc. 2013-34, sec. 4.01(4) and (5), 2013-43 I.R.B. at 399. Respondent alleges that their personal residence, Rogers & Associates, and multiple bank accounts with substantial assets are held solely in Mrs. Rogers' name. Respondent also argues that Mrs. Rogers does not satisfy a third requirement of the threshold test because portions of the understatements are attributable to her activities, specifically SRI, and deductions for personal expenses. See Rev. Proc. 2013-34, sec. 4.01(7).

---

[39]Rev. Proc. 2013-34, supra, applies to all requests filed on or after September 16, 2013, and requests pending in any Federal court on or after September 16, 2013. Id. sec. 7, 2013-43 I.R.B. at 403.

**[*111]** A threshold requirement for equitable relief is that the taxpayers not have made a transfer of a "disqualified asset" from the nonrequesting spouse to the requesting spouse, defined as any transfer "if the principal purpose of the transfer was the avoidance of tax or payment of tax." Rev. Proc. 2013-34, sec. 4.01(5); see sec. 6015(c)(4)(B)(i). The parties have presented little evidence with respect to the value of these assets and the timing of the alleged transfers to Mrs. Rogers, making it difficult for the Court to determine whether Mrs. Rogers satisfies the threshold test with respect to the underpayments that are not attributable to her. Mrs. Rogers has not presented any rebuttable evidence to support a finding that the transfers do not cause her to fail the threshold test. The alleged transfers are not necessarily determinative as we also find that the equities in these cases do not support the granting of section 6015(f) relief for the deficiency years.

b.  Factor Test for Section 6015(f) Relief

Respondent argues that under the list of factors enumerated in Rev. Proc. 2013-34, sec. 4.03, 2013-43 I.R.B. at 400, it is equitable to hold Mrs. Rogers jointly and severally liable for the tax for the deficiency years. We agree. The nonexclusive factors include: (1) marital status, (2) economic hardship, (3) the requesting spouse's knowledge or reason to know, (4) a legal obligation to pay the tax, arising from a divorce decree or other binding agreement, (5) a significant

[*112] benefit gained by the requesting spouse, (6) the requesting spouse's compliance with income tax laws, and (7) her mental or physical health at the time of filing the return or the request for relief. No single factor, or the presence or absence of a majority of the factors, is determinative; all factors are considered and weighted appropriately. Kellam v. Commissioner, T.C. Memo. 2013-186, at *26. This Court may consider the IRS guidelines, but is not bound by them, in evaluating the facts and circumstances of a case. Molinet v. Commissioner, T.C. Memo. 2014-109, at *6; see Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011). Mrs. Rogers argues that the following equitable factors weigh in her favor: she will suffer an economic hardship if not granted relief, she did not receive a significant benefit from the understatements, she suffers chronic health problems, and she has experienced abuse and control by Mr. Rogers that negates her knowledge of the understatements. The factors that we consider for relief under section 6015(f) are similar to the factors relevant to the equity requirement of section 6015(b)(1)(D). As discussed above, Mrs. Rogers did not satisfy the equity requirement of section 6015(b). Likewise we find that she is not entitled to equitable relief under section 6015(f).

Economic hardship exists if payment of the deficiency in whole or in part would cause the requesting spouse to be unable to pay her reasonable basic living

[*113] expenses.  Rev. Proc. 2013-34, sec. 4.03(2)(b).  Whether a requesting spouse will suffer economic hardship is determined on the basis of rules similar to those provided in section 301.6343-1(b) (4), Proced. & Admin. Regs. (Requirement to release levy and notice of release), including the requesting spouse's assets and income, age, employment status and history, ability to earn, dependents, living expenses, medical costs, and extraordinary circumstances.  Rev. Proc. 2013-34, sec. 4.03(2)(b).  The IRS compares the requesting spouse's income with Federal poverty guidelines and with reasonable living expenses.  Id.  The determination of economic hardship does not include the maintenance of an affluent or luxurious standard of living.  Sec. 301.6343-1(b)(4), Proced. & Admin. Regs.  Mrs. Rogers has not established that she would be unable to pay her reasonable, basic living expenses or would otherwise suffer economic hardship if relief is not granted.  In financial documents that she submitted to the IRS she reported substantial assets with values in excess of the deficiencies sustained here. Respondent also alleges that Mrs. Rogers has undisclosed personal assets as evidenced by insurance policies for personal property and assets held in trust that she did not list on her forms submitted to the IRS.  She submitted multiple copies of the same form with significant unexplained discrepancies.  We find that Mrs. Rogers will not suffer economic hardship and will not be unable to pay her

[*114] reasonable, basic living expenses. In addition she has received a significant benefit from the understatements. As discussed above she enjoyed a high standard of living that included expensive vacations and luxury purchases. For reasons discussed above relating to section 6015(b) relief, Mrs. Rogers had knowledge of the understatements. She knew that petitioners paid little or no income tax despite Mr. Rogers' substantial income from his law practice for 2005, 2006, and 2007. She also knew that the sale of the subdivision lots generated a substantial amount of revenue and that SRI reported losses. Moreover, the number of years at issue show a pattern of noncompliance. Mrs. Rogers continued to file joint tax returns with her husband as recently as 2014 despite her knowledge that respondent had issued the notices of deficiency.

Consideration of the above factors supports a decision to deny Mrs. Rogers section 6015(f) equitable relief. However, we must consider an additional factor, that Mrs. Rogers experienced abuse and control from her husband, preventing her from challenging the understatements because of fear of retaliation. Rev. Proc. 2013-34, sec. 4.03. We do not find credible or plausible the argument that Mr. Rogers had control over petitioners' financial information or financial decisions. The evidence shows that Mrs. Rogers was actively involved in their financial affairs and contradicts her claims that Mr. Rogers was financially controlling. She

[*115] handled insurance issues, obtained loans and signed loan documents, and maintained numerous bank accounts as the sole owner. She paid household expenses and held substantial assets in her own name. She became the office manager of Rogers & Associates during 2009. She paid bills and endorsed checks with her husband's signature stamp. Furthermore, there is no evidence of Mr. Rogers' evasiveness or deceitfulness. He reviewed the joint tax returns with Mrs. Rogers each year and answered her questions. She was aware that they paid little or no income tax but thought it was because her husband was a good attorney. She accompanied her husband on business trips and attended business meetings. She was involved in decisionmaking for SRI's subdivision project and was its sole shareholder.

Mrs. Rogers asks us to consider whether psychological abuse by her husband makes it inequitable to find her liable.[40] She argues that abuse by her husband made her unable to challenge the tax returns despite her knowledge. The Court may consider whether abuse affects our decision with respect to the other factors we considered above for determining whether to grant equitable relief. See Rev. Proc. 2013-34, supra. Abuse includes efforts to control, isolate, humiliate,

---

[40]Mrs. Rogers submitted three Forms 8857 within less than one year and reported that she was not the victim of abuse on the first two forms and was an abuse victim on her third form.

[*116] and intimidate the requesting spouse or to undermine her ability to reason independently. Id. sec. 4.03(2)(C)(iv). Mrs. Rogers testified at trial that she did not fear for her safety. She believed that Mr. Rogers performed well as an attorney during a substantial portion of the deficiency years despite his alcohol use and testified that she would have made him stop working if she believed that he could not perform in his profession. However, his behavior humiliated her and isolated her. We are not convinced that Mr. Rogers exercised such control over Mrs. Rogers as would have prevented her from challenging the tax returns or make it inequitable to hold her liable. She exercised control over financial decisions, including those relating to SRI and Rogers & Associates. She reviewed the returns with her husband and asked questions. The assertions of control contradict the record. We sympathize that Mrs. Rogers has experienced her own health problems and stress, anxiety, and depression in connection with her husband's illness and hospitalization in 2009. However, we do not find that it is inequitable to hold her jointly and severally liable for the deficiencies, penalties, and interest at issue in the light of all the facts and circumstances. She knew about the understatements and significantly benefited from them. She will not suffer economic hardship if relief is not granted. Accordingly, we deny her claim for equitable relief under section 6015(f) for the deficiency years.

[*117] IV.   Penalties and Addition to Tax

Respondent determined penalties for the deficiency years as follows.  For 2005 he determined an accuracy-related penalty against petitioners under section 6662(h) for gross valuation misstatements relating to deductions claimed for the Sugarloaf transaction and under section 6662(a) and (b)(1) and (2) for the portion of the underpayment due to omitted income and disallowed business expense deductions.  For 2006 he determined a section 6663 fraud penalty against Mr. Rogers and, in the alternative, he determined section 6662(a) and (h) accuracy-related penalties against petitioners.  See sec. 6662(b).  For 2007 and 2009 he determined section 6662(a) accuracy-related penalties, and for 2009 he determined an addition to tax under section 6651(a) for the late filing of petitioners' joint income tax return.  Finally in the alternative to the section 6662(h) penalties for 2005 and 2006, respondent determined a section 6662A penalty for understatements attributable to an undisclosed reportable or listed transaction with respect to petitioners' investments in the Sugarloaf transactions.  See sec. 6662A(e)(2)(B).

After trial in these consolidated cases, on January 23, 2018, petitioners filed a motion for partial summary judgment with respect to the above penalties on the basis of our recent decision in Graev v. Commissioner, 149 T.C. ___ (Dec. 20,

[*118] 2017). We will deny petitioners' motion with respect to the section 6663 fraud penalty for 2006 and the section 6651(a) late filing addition to tax as moot because we find that petitioners are not liable for these penalties, as described further infra. Petitioners' liability for the section 6662 accuracy-related penalties and the section 6662A penalty will be addressed after the parties have an opportunity to further address this issue and will not be addressed therein.

A.     Fraud Penalty

Section 6663 imposes a 75% penalty on the portion of an underpayment that is attributable to fraud. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Prof'l Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The clear and convincing standard applies to both the existence of the underpayment and the existence of fraud. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); DiRicco v. Commissioner, T.C. Memo. 2009-300. To meet this burden, the Commissioner must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. Sadler v. Commissioner, 113 T.C. 99, 102 (1999); Parks v. Commissioner, 94 T.C. at 660-661. If the Commissioner establishes that any portion of the understatement is due to fraud, the entire underpayment is treated as attributable to fraud, except to the extent that the taxpayer can establish that a

[*119] portion is not attributable to fraud. Sec. 6663(b); DelVecchio v. Commissioner, T.C. Memo. 2001-130, slip op. at 12, aff'd, 37 F. App'x 979 (11th Cir. 2002). Fraud is not imputed from one spouse to another; in the case of a joint tax return, the Commissioner must prove fraud as to each spouse. See sec. 6663(c); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), aff'd, 470 F.2d 87 (1st Cir. 1972). Here respondent has asserted fraud only against Mr. Rogers for 2006.

The existence of fraud is a question of fact to be resolved from consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd without published opinion, 578 F.2d 1383 (8th Cir. 1978). Because fraud can rarely be established by direct proof of the taxpayer's intention, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Several indicia, commonly known as "badges" of fraud, are circumstantial evidence that may give rise to evidence of fraudulent intent. Parks v. Commissioner, 94 T.C. at 664-665. Although no single factor is determinative to establish fraud, the existence of several indicia may be persuasive circumstantial evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), aff'g T.C. Memo. 1982-603. "Badges" of fraudulent intent include: (1) understating income, (2) maintaining

[*120] inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. Spies v. United States, 317 U.S. 492, 499 (1943); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). As few as one or two badges of fraud may be sufficient to prove fraudulent intent. Bertoli v. Commissioner, 103 T.C. 501, 518 (1994). The taxpayer's entire course of conduct can be indicative of fraud. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).

The evidence shows that petitioners underreported income, claimed personal expenses as business deductions, and inconsistently reported related company transactions. Many of these failures are due to the disorganized structure of their business transactions among their related business entities and their failure to maintain adequate records, resulting in their inability to substantiate a significant portion of their claimed deductions rather than an intent to evade taxes known to be owing. Mr. Rogers promoted and implemented the Sugarloaf tax shelter generating millions of dollars in losses for investors and engaged in the tax shelter in 2006 to lower petitioners' taxable income. They failed to report over

[*121] $1 million in income that Mr. Rogers received from his promotion of the Sugarloaf transactions. His wholly owned corporation PPI also failed to report gross receipts of nearly $700,000 for 2006. A substantial portion of PPI's underreported gross receipts arose from transactions with related entities.

When Mr. Rogers was preparing petitioners' 2006 joint income tax return, he initially included the trustee's fees that he received from Sugarloaf investors as income in a draft of the return. However, before he submitted the return, he received notice that respondent had determined a deficiency for 2003 relating to distressed debt transactions that Mr. Rogers promoted and implemented through a separate entity, Warwick Trading, LLC. See Superior Trading, LLC v. Commissioner, 137 T.C. 70. He revised his 2006 return and took the position that the trustee's fees were not income because they were a return of capital from Sugarloaf and a reimbursement of disallowed 2003 deductions. Sugarloaf was not involved in the distressed debt transactions at issue in Superior Trading. He advanced significant amounts of money to Sugarloaf or on its behalf in the beginning stages of his implementation and promotion of the tax shelter. He admits that when he received the checks from the investors in 2006, he thought that the amounts would be taxable income and later recharacterized the checks as an expense reimbursement. He argues that his reasoning changed when

[*122] respondent asserted the 2003 deficiency. As a result of the above position, petitioners did not report the trustee's fees as income on their 2006 joint return and underreported Mr. Rogers' income by over $1 million. However, we do not find that Mr. Rogers' reporting position constitutes fraudulent intent. In connection with this changed reporting position, petitioners submitted during the IRS examination altered checks that deleted references to trustee's fee on the memorandum line of checks received from Sugarloaf investors. Mr. Rogers claims that his assistant altered the checks in defiance of his direction not to do so. We do not find this charge to be credible. This incident occurred in 2009 before his hospitalization for alcoholism, and Mr. Rogers later submitted the unaltered checks. After consideration of the badges of fraud, we find that he did not fraudulently mislead respondent. Petitioners timely filed their joint tax returns and the returns on their numerous entities for each year, except for the late filing for 2009. We do not believe that Mr. Rogers had a fraudulent intent to evade tax. Although at times we have found his testimony to lack credibility, his actions do not rise to the level of fraud. Accordingly, we hold that he is not liable for the section 6663 fraud penalty for 2006. As we have not imposed the fraud penalty, we must determine whether petitioners are liable for the accuracy-related penalties under section 6662(a) and (h) for 2006.

**[\*123]** B.    Failure To File Addition to Tax

Section 6651(a)(1) imposes an addition to tax for the failure to timely file a tax return.  Sec. 6651(a).  The addition to tax is equal to 5% of the amount required to be shown as tax on the return if the failure to file is for not more than 1 month, with an additional 5% for each additional month or fraction thereof during which the failure continues, not to exceed a 25% addition.  Petitioners did not request an extension of time to file their 2009 return.  It was postmarked October 14, 2010.

Respondent asserted the failure to timely file addition to tax for the first time in his answer; the timing affects which party bears the burden of proof in regard to the availability of the reasonable cause exception to that penalty.  As a general rule, once the Commissioner satisfies his burden of production under section 7491(c) establishing the appropriateness of a determined penalty, the taxpayer bears the burden of proving that reasonable cause exists for his late filing as a defense to the imposition of the penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  The Commissioner bears the burden of proof "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a)(1).  Thus, as respondent asserted the late filing addition in the answer, he bears the burden of proving the absence of

**[\*124]** reasonable cause for the Court to impose the penalty if the penalty is either a "new matter" or an "increase[] in deficiency" within the meaning of Rule 142(a). RERI Holdings I, LLC v. Commissioner, 149 T.C. ___, ___ (slip op. at 62-63) (July 3, 2017); Rader v. Commissioner, 143 T.C. 376, 389 (2014), aff'd in part, appeal dismissed in part, 616 F. App'x 391 (10th Cir. 2015).

Reasonable cause exists for a late filing if the taxpayer exercised ordinary care and prudence but was nevertheless unable to file on time. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect is defined as an intentional failure or reckless indifference. United States v. Boyle, 469 U.S. 241, 245 (1985). Illness or incapacity of a taxpayer or a member of his immediate family may be reasonable cause for late filing. See Rogers v. Commissioner, T.C. Memo. 2016-152; Joseph v. Commissioner, T.C. Memo. 2003-19; Hobson v. Commissioner, T.C. Memo. 1996-272; Tabbi v. Commissioner, T.C. Memo. 1995-463; Hayes v. Commissioner, T.C. Memo. 1967-80. However, a taxpayer's selective inability to perform his tax obligations while performing his regular business does not excuse the failure to file. See Watts v. Commissioner, T.C. Memo. 1999-416; Kemmerer v. Commissioner, T.C. Memo. 1993-394. Petitioners argue that they had reasonable cause for their late filing for 2009 because of Mr. Rogers' extended illness. We agree. Mr. Rogers was hospitalized for an extended time in 2009, and

[*125] he continued to deal with his illness after his release. Mrs. Rogers was preoccupied with her husband's illness and took on substantial additional responsibilities in their businesses. Her health also suffered as she dealt with her husband's condition. In prior years petitioners timely filed their income tax returns under extension. However, they failed to request an extension for 2009; their return would have been timely had they done so. Cf. Judge v. Commissioner, 88 T.C. 1175 (1987) (no reasonable cause found despite illness where taxpayer had a long history of delinquent filing). Respondent has not established that petitioners lacked reasonable cause. We find that petitioners had reasonable cause for the late filing and it was not due to willful neglect. Accordingly, petitioners are not liable for the section 6651(a) late filing addition to tax for 2009.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate order will be issued.

**[*126]**                                    APPENDIX[1] A

2005 Schedule C-1

| Expense | Per return | Allowed | Disallowed |
|---------|-----------|---------|------------|
| Interest | $50,683 | -0- | $50,683 |
| Rent | 1,722 | -0- | 1,722 |
| Alarm services | 654 | -0- | 654 |
| Travel | 25,320 | -0- | 25,320 |

[1]For purposes of the following Appendixes A through E, "per return" is the amount listed on the return, "petitioners' concession" is the amount of the expenses deducted on the return that petitioners have conceded, "stipulated" is the amount that respondent has conceded is deductible, "allowed" is the additional amount in excess of the stipulated amount that petitioners are entitled to deduct, and "disallowed" is the amount of the deductions per return that the Court disallows, not including petitioners' concessions.

2006 Schedule C-1

| Expense | Per return | Petitioners' concession | Stipulated | Allowed | Disallowed |
|---|---|---|---|---|---|
| Repairs | $15,234 | --- | --- | -0- | $15,234 |
| Office expense | 11,915 | --- | --- | -0- | 11,915 |
| Legal fees | 137,111 | --- | --- | $62,023 | 75,088 |
| Interest | 7,904 | --- | --- | -0- | 7,904 |
| Insurance | 4,530 | $3,094 | $493 | -0- | 943 |
| Depreciation | 7,500 | --- | --- | -0- | 7,500 |
| Utilities | 7,829 | --- | --- | -0- | 7,829 |
| Meals | 5,951 | --- | --- | -0- | 5,951 |
| Travel | 55,110 | --- | --- | -0- | 55,110 |
| Taxes and licenses | 12,029 | 6,001 | --- | -0- | 6,028 |
| Legal | 1,000 | --- | --- | -0- | 1,000 |
| Fiduciary | 1,000 | --- | --- | -0- | 1,000 |
| Publications | 4,686 | --- | --- | 1,509 | 3,177 |
| Dues and subscriptions | 3,200 | --- | --- | 1,272 | 1,928 |
| Fees | 151,128 | 150,000 | --- | -0- | 1,128 |
| Miscellaneous | 1,209 | --- | --- | -0- | 1,209 |
| Computer services | 4,336 | --- | --- | 4,336 | -0- |
| Business gifts | 800 | --- | --- | 100 | 700 |
| Bank service charges | 1,435 | --- | --- | -0- | 1,435 |
| Alarm services | 902 | --- | --- | -0- | 902 |

2007 Schedule C-1

| Expense | Per return | Petitioners' concession | Stipulated | Allowed | Disallowed |
|---|---|---|---|---|---|
| Repairs | $5,352 | $1,743 | $464 | -0- | $3,145 |
| Legal fees | 120,820 | --- | 4,471 | $71,202 | 45,147 |
| Interest | 43,035 | --- | --- | -0- | 43,035 |
| Insurance | 6,853 | --- | --- | -0- | 6,853 |
| Travel | 130,540 | --- | --- | -0- | 130,540 |
| Meals | 7,101 | --- | --- | -0- | 7,101 |
| Automobile | 5,582 | --- | --- | -0- | 5,582 |
| Supplies | 8,336 | 922 | --- | 1,865 | 5,549 |
| Taxes and licenses | 10,885 | --- | --- | -0- | 10,885 |
| Utilities | 11,209 | --- | --- | -0- | 11,209 |
| Alarm services | 1,000 | --- | --- | -0- | 1,000 |
| Rent | 5,166 | --- | --- | -0- | 5,166 |

2009 Schedule C-1

| Expense | Per return | Stipulated | Allowed | Disallowed |
|---|---|---|---|---|
| Legal and professional fees | $665,242 | --- | $539,061 | $126,181 |
| Returns and allowances | 1,414,898 | $815,809 | 599,089 | -0- |
| Travel | 130,540 | --- | -0- | 130,540 |
| Meals | 7,101 | --- | -0- | 7,101 |

[*129]                              APPENDIX B

### Schedule C-2 Deductions Per Return

| Expense | 2005 | 2006 | 2007 |
|---|---|---|---|
| Depreciation | [1]$14,848 | $10,909 | $10,909 |
| Taxes and licenses | [2]12,997 | 13,065 | [3]17,380 |
| Repairs | 7,763 | --- | --- |
| Interest | 14,537 | --- | --- |
| Utilities | [4]9,320 | --- | --- |
| Bank service charges | 2,089 | --- | --- |

[1]Petitioners concede $3,939 of the 2005 depreciation deduction with $10,909 remaining in dispute.

[2]The 2005 taxes include $4,080 relating to farmland and $8,917 relating to the Manitou house. Petitioners did not establish the deductibility of the taxes paid with respect to the farmland. It is further unclear from the record whether respondent has conceded the taxes relating to the farmland.

[3]Petitioners deducted taxes and licenses of $17,380 relating to the Manitou house. Petitioners incurred additional taxes and licenses of $2,673 for 2007 that petitioners did not deduct on their return. Respondent concedes that they are entitled to deduct the $2,673 on Schedule C-2 for 2007.

[4]The source of the $9,320 of utilities is not clear from the record. Petitioners presented evidence that $3,109 related to their personal residence and $3,000 related to the Manitou house.

**[*130]**                            APPENDIX C

Nondeductible Expenses Relating to Manitou House on
Schedules C-1 and C-2 and SRI's and PPI's S Corporation Tax Returns[1]

| Expense | 2005 | 2006 | 2007 |
|---|---|---|---|
| Rent | --- | $60,000 | --- |
| Depreciation | $10,909 | 10,909 | $10,909 |
| Interest | 14,537 | --- | --- |
| Repairs | 33,833 | --- | --- |
| Taxes and licenses | 8,917 | 13,065 | 17,380 |
| Utilities | 3,000 | 2,169 | --- |
| Bank service | 2,089 | --- | --- |
| Insurance | --- | 943 | --- |

[1]SRI deducted the rent and utilities for 2006 on its S corporation tax return. Petitioners deducted the 2006 insurance on Schedule C-1. The 2005 repairs were deducted as follows: $7,763 on Schedule C-2 and $26,070 on PPI's S corporation tax return. The remainder of the expenses were deducted on Schedule C-2.

**[*131]**                    APPENDIX D

## 2006 SRI Deductions

| Expense | Per return | Petitioners' concession | Stipulated | Allowed | Disallowed |
|---|---|---|---|---|---|
| Rent | $60,000 | --- | --- | -0- | $60,000 |
| Interest | 175,000 | --- | --- | -0- | 175,000 |
| Depreciation | 13,160 | --- | | -0- | 13,160 |
| Auto and truck | 2,000 | --- | --- | -0- | 2,000 |
| Bank charges | 5,770 | --- | | -0- | 5,770 |
| Employee bonuses and reimbursements | 21,700 | --- | | -0- | 21,700 |
| Insurance | 5,408 | --- | | -0- | 5,408 |
| Legal and professional fees | 60,243 | --- | --- | $60,243 | -0- |
| Meals and entertainment | 2,861 | --- | --- | -0- | 2,861 |
| Miscellaneous | 51,363 | $1,500 | --- | -0- | 49,863 |
| Parking | 2,075 | | --- | -0- | 2,075 |
| Telephone | 3,740 | --- | --- | -0- | 3,740 |
| Utilities | 2,169 | --- | --- | -0- | 2,169 |
| Consulting fee | 710,366 | --- | $710,366 | -0- | -0- |

APPENDIX E

## 2005 PPI Deductions

| Expense | Per return | Petitioners' concession | Stipulated | Allowed | Disallowed |
|---|---|---|---|---|---|
| Repairs | $26,070 | --- | --- | -0- | $26,070 |
| Legal and professional fees | 908,474 | --- | --- | $40,245 | 868,229 |
| Computer services | 7,636 | --- | --- | -0- | 7,636 |
| PTI subsidy | 124,520 | --- | --- | -0- | 124,520 |
| Meals | 6,997 | --- | --- | -0- | 6,997 |
| Taxi | 3,286 | $1,752 | --- | -0- | 1,534 |
| Airfare | 7,538 | 3,990 | --- | -0- | 3,548 |
| Hotel | 9,312 | 8,406 | --- | -0- | 906 |
| Multicred fee | 907,263 | --- | $90,000 | -0- | 817,263 |
| Doctor | 8,207 | --- | --- | -0- | 8,207 |
| Gasoline | 4,175 | --- | --- | -0- | 4,175 |
| Dentist | 4,085 | --- | --- | -0- | 4,085 |

[*133]                    2006 PPI Deductions

| Expense | Per return | Stipulated | Allowed | Disallowed |
|---|---|---|---|---|
| Salaries and wages | $240,000 | $363,538 | -0- | -0- |
| Repairs | 3,387 | --- | $258 | $3,129 |
| Employee benefit programs | 37,283 | --- | 37,283 | -0- |
| Insurance | 3,818 | --- | 3,818 | -0- |
| Legal and professional fees | 1,070,771 | --- | 31,231 | 1,039,540 |
| Travel | 32,296 | --- | -0- | 32,296 |

[*134]                          2009 PPI Deductions

| Expense | Per return | Petitioners' concession | Stipulated | Allowed | Disallowed |
|---|---|---|---|---|---|
| Salaries and wages | $10,000 | --- | $5,000 | -0- | $5,000 |
| Repairs | 15,372 | --- | --- | $5,647 | 9,725 |
| Rent | 560 | --- | --- | -0- | 560 |
| Taxes and licenses | 13,779 | --- | --- | 30 | 13,749 |
| Interest | 1,866 | --- | --- | -0- | 1,866 |
| Employee benefit program | 23,604 | --- | --- | 23,604 | -0- |
| Accounting | 8,717 | $2,500 | --- | 1,062 | 5,155 |
| Bank charges | 433 | --- | --- | -0- | 433 |
| Insurance | 3,738 | --- | --- | -0- | -0- |
| Legal and professional fees | 132,163 | --- | --- | 132,163 | -0- |
| Miscellaneous | 1,171 | --- | 366 | -0- | 1,171 |
| Office | 18,462 | --- | --- | -0- | 18,096 |
| Printing | 591 | --- | --- | -0- | 591 |
| Parking | 240 | --- | --- | 240 | -0- |
| Brad Todd Expenses | 4,846 | --- | | -0- | 4,846 |